Mastin' B. Stecher, J.
This is a motion to direct the Clerk of this court to restore to the moving parties, the tenants in these proceedings, rents previously deposited by them under an order made by me pursuant to section 755 of the Real Property Actions and Proceedings Law.[1] In the 40-year history of this statute[2] no similar motion had been recorded in any reported case.
On July 30, 1969, the tenants'upon the admissions and stipulations of the landlord, effectively established their defense under that statute to the landlord’s summary proceedings for the nonpayment of rent. Indeed the stipulation was surplusage, the record of the New York Department of Housing and Building *132 [3] providing more than adequate evidence of a deplorable slum.[4]
The orders entered by consent of the parties directed the payment of accrued and future rentals to the Clerk of the court and permitted half of such deposit to be used to correct the offending conditions. Except for the last month in which the respective moving parties resided in the building — in some cases October, 1969, in others November of 1969 — the orders to deposit rents were obeyed. To the date of this opinion no application has been made by the landlord to use any of the rents on deposit with the court, although the stipulation and the statute (Real Property Actions and Proceedings Law, § 755, subd. 3) provide ample authority for such use.
A hearing was held following the submission of the motion (CPLR 2218) and thereafter the tenants with the landlord’s consent submitted in evidence a reinspection report made by the Department of Buildings of the City of New York. It revealed that approximately 20 new violations had been recorded in addition to the 100 or so which existed at the time of trial; that many of the apartments in the building had become and remained vacant; and that some 22 prior violations had been removed in part, resulting from the replacement by the landlord of a missing oil burner unit.
Despite the landlord’s efforts, these tenants in decent respect for the quality of their own lives and those of their families abandoned this rotting East Harlem tenement[5] and now ask the court to restore to them the rents it holds on deposit.
At the hearing the landlord — which offered neither testimony nor evidence of any kind — moved that the stay be vacated and *133 that the deposited rents he turned over to it on the grounds that the tenants failed to deposit additional rent for the final months of their respective occupancies (Real Property Actions and Proceedings Law, § 755, subd. 2).
On this record the court has three choices: to release the fund to the landlord, restore it to the tenants, or maintain it in the possession of the Clerk.
In the normal course of events the landlord would not receive the funds until the conditions constituting a “ constructive eviction” — whether existing at the time of trial or noted thereafter — were cured (Brissett v. Cherry, 54 Misc 2d 353). To deliver the deposited rents to the landlord now would encourage other landlords in similar position to do nothing to eliminate hazards to life and health. The court would be reduced to the role of rent collector (cf. Matter of Schaeffer v. Montes, 37 Misc 2d 722, 730) and when, as here, the conditions of life became intolerable and tenants could do nothing but leave, the landlord at his leisure would pick up his accrued, collected rents. Neither the court nor the statute was created for that purpose. The landlord’s motion is denied.
The Legal Aid Society appearing for the tenants urges restoration of the rents to the tenants on the theory of common-law constructive eviction. It argues that the courts of this State have been in error these many years in holding that the doctrine is inapplicable as a defense to an action for rent if the tenant retains possession of the premises (Boreel v. Lawton, 90 N. Y. 293; Edgerton v. Page, 20 N. Y. 281). Error by some standard it may be, but the “ error ” of the Court of Appeals is the law of the Civil Court. The archaic rent-in-exchange-for-possession doctrine[6] is still the law of the State of New York (Barash v. Pennsylvania Term. Real Estate Corp., 26 N Y 2d 77), absent any statute to the contrary.
There are, of course, many statutes to the contrary in the crazy-quilt pattern of New York legislative enactments permitting tenants to occupy premises, paying no rent or less than the sum to which they had agreed. Thus for instance, had these tenants been a bit poorer or a bit less proud and therefore welfare recipients (Social Services Law, § 143-b); or had they effectively pleaded and proved that the violations were ‘ ‘ rent impairing ” (Multiple Dwelling Law, § 302-a); or had the Department of Buildings revoked the certificate of occupancy *134 (Multiple Dwelling Law, §§ 301, 302); or had the department found that a public nuisance existed (Multiple Dwelling Law, § 309); or had there been an administrative determination that a dangerous condition existed (Administrative Code of City of New York, § Y51-5.0, subd. h, par. [3]; Emergency Housing Rent Control Law, § 4, subd. 5, par. [c]; L. 1946, ch. 274, as amd. by L. 1955, ch. 685; Rent, Eviction and Rehabilitation Regulations, § 34.3), the objective of the tenants — occupying the premises at reduced rentals or no rentals at all — might have been accomplished, because the respective statutes so provide. But section 755 of the Real Property Actions and Proceedings Law does not so provide; it is silent on the subject.
Recourse to the bill jacket assembled in the office of Governor Franklin D. Roosevelt yields a clue to the intent of the Legislature[7] (cf. Shiles v. News Syndicate Co., 27 N Y 2d 9, 20) when it enacted this bill. Judge — then Assemblyman — Francis E. Rivers, its sponsor, in a memorandum to the Governor urging its approval, described graphically the dilapidated condition of Harlem’s black ghetto, the Lower East Side, and certain sections of Brooklyn; the impotence of the courts to effect change; and the insufficient number of tenement house inspectors assigned to enforcement tasks. (The tragedy is that the report could be reissued in 1970 with little modification — except that the buildings are now 40 years older!)
From Judge Rivers’ own description of the bill’s intended effect, it is clear that the statute’s sole purpose was to force the repair of buildings. As he expressed it in the conclusion to his memorandum, “ every tenant who had a condition of serious disrepair in his apartment would become part of the personnel (of the Tenement House Department) causing repairs to be made.”
Similarly, when 35 years later the so-called Rent Strike Bill was enacted (Real Property Actions and Proceedings Law, art. 7-A; L. 1965, ch. 909), providing essentially the same relief for the same conditions, only this time at the tenants’ initiative rather than in response to a nonpayment summary proceeding (cf. Real Property Actions and Proceedings Law, § 755), the Legislature made clear its intent that the rents are to be used to cure the offending conditions and provide safe, sanitary housing to the people of the City of New York (L. 1965, ch. 909, § 1).
In short, .section 755 of the Real Property Actions and Proceedings Law and its predecessor statutes were not designed to *135 give tenants any new substantive rights (Davar Holdings v. Cohen, 255 App. Div. 445, affd. 280 N. Y. 828), but to force landlords to comply with applicable housing laws.
Accordingly, so long as there is any likelihood that the repairs to the realty will be made — as some already have — the purpose of the statute will best be served by retaining the fund on deposit. Should it be factually demonstrated at a later date that the retention of the fund will no longer serve the purpose of the statute, the court will reconsider the disposition of the fund.
Both motions are denied. The fund will remain on deposit with the Clerk subject to the further order of this court.

. The statute, as it then existed, permitted the court to stay evictions for nonpayment of rent if conditions had been officially noted by a New York City agency which in the court’s opinion constituted a “ constructive eviction ”; provided, however, that all past due rents and rents from time to time to become due thereafter were deposited with the Clerk of the court. Since then the statute has been amended to permit its application without the intervention of an official agency and to extend its effect throughout the State (L. 1969, ch. 820).

. It was first enacted as chapter 871 of the Laws of 1930. It was re-enacted as section 1446-a of the Civil Practice Act in 1939 and in 1962 assumed its present place as section 755 of the Real Property Actions and Proceedings Law.

. The departmental records marked in evidence contained 19 pages reciting nearly 100 violations. They revealed an inoperative heating system and absence of fuel in midwinter, no hot water, inadequate cold water, leaking pipes, inoperative radiators, toilets which failed to flush, defective electrical fixtures, hazardous fire escapes and fire stairs, impermissible flammable structural material, defective fire egress, exterior broken and crumbling brick, missing roof coping and rain leaders, a leaking roof, peeling paint, crumbling plaster, broken lavatory floor tiles and leaks in ceilings, accumulations of rubbish in yards, courts, and on the roof, and pages of broken windows and sashes.

. This building presents but one example of the conditions which have led New York to be called “the first city of America in the quantity and detest-ability of its slum dwellings ” (Slumlordism, by Sax and Hiestand, 65 Mich. L. Rev. 869, 870).

. They testified that broken ceilings and defective plumbing united to cascade water and other matter upon a person flushing a toilet. Holes in walls were invasion routes for rats. Broken floors and cracked walls were the breeding grounds of hordes of roaches and other insects. One tenant could not use the toilet bowl in her apartment without the shelter of an open umbrella.

. “ Law of Landlord-Tenant: A Critical Evaluation of the Past with Guidelines for the Future ” by Quinn and Phillips, 38 Fordham L. Rev. 225; “ Poverty, Civil Liberties, and Civil Rights: A Symposium ” by Dorsen, 41 N". Y. U. L. Rev. 328, 348.

. N. Y. State Library, Legislative Reference Section, Albany, N. Y.