Louis Okin, J.
Respondent, Housing & Development Administration of the City of New York (HDA), has brought on a motion, by order to show cause dated April 1, 1975, for an order staying the implementation of a decision made in this proceeding by Hearing Officer John A. Milano (Torres v Ragonesi, 80 Misc 2d 849), pending the determination of an application by HDA for the appointment of a receiver for premises 204-06 Clinton Street, Manhattan, New York City, in accordance with section 309 of the Multiple Dwelling Law.
The order to show cause is based upon an affirmation made by Howard Malatzky, Esq., an attorney in the offices of HDA, to which are attached inspection reports relating to the subject premises, and communications from HDA with respect to this building.
This motion is opposed by the owner, respondent Ragonesi, who urges that the court sign orders previously submitted to this court in this proceeding, directing HDA, and the other bureaus and departments having jurisdiction, to vacate the subject building.
This proceeding was initially instituted by petitioner, a tenant at 204-06 Clinton Street, who sought an order requiring the owner to correct various pending violations and to furnish services which petitioner claimed that he and the other tenants were not receiving, or alternatively, for punitive relief against the owner.
The proceedings finally came on for a hearing before Hearing Officer Milano who, with commendable zeal, personally visited the subject premises.
*86 Prior to the visit by Hearing Officer Milano several inspections by department inspectors resulted in reports, which concluded that the premises should not be vacated. The inspectors recognized that there were numerous violations pending which the owner had failed to remove; however, the inspectors reported that basic essential services were being maintained and that accordingly an order vacating the building should not be issued.
On the basis of his personal inspection, Hearing Officer Milano came to the conclusion that, in spite of the inspectors’ reports, HDA should be directed by this court to vacate this building (see Torres v Ragonesi, supra).
Thereafter, orders were submitted to the undersigned, on the basis of that decision, directing HDA to vacate the building.
These orders, and the mandatory vacatur of the building was opposed by HDA.
Since the submission of the vacate orders, this court has conferred with representatives of HDA, attorneys for petitioner, and with representatives of community organizations.
Section D26-56.01 of article 56 of the Administrative Code of the City of New York provides that the department (HDA) "may order or cause any dwelling or part thereof which is unfit for human habitation to be vacated.”
Applicable statutes and numerous other provisions provide for inspections by representatives of HDA and other city departments, reports to be served upon owners, and other corrective steps and procedures.
The statutory and regulatory scheme which governs and controls the supervision of residential buildings in the City of New York is based upon the social and economic premise that it is the responsibility of the owner of residential buildings to maintain the building, remove violations and insure that the tenants have habitable premises in which to live.
Implementation of this concept of owner responsibility led to the imposition of personal, civil and criminal responsibility on controlling stockholders, officers and directors of corporate owners of residential properties. (Multiple Dwelling Law, § 4, subd 44; Administrative Code, § D26-1.07, subd a, par 45.)
To enable representatives of the city, and other interested parties, to focus on the individuals responsible for maintaining the residential stock in the city, statutes and rules were *87 promulgated requiring residential buildings to obtain specific registration numbers, which must be prominently displayed in the building (Administrative Code, §§ B26-41.01, D26-41.15), and to register with HDA specific managing agents who are required to have an address in the City of New York (Administrative Code, § D26-41.03).
True, it was found that sometimes this approach, based upon our adherence to this concept of private property, and the philosophy of making the person who owned or was in control of residential property responsible for the proper maintenance of such property, sometimes does not work. So, an Emergency Repair Program was developed, by which the city, under certain circumstances, will make emergency repairs, and supply services at the expense of the owner. (Administrative Code, § D26-54.01, subd a, par (1); §§ 564-15.0 through 564-31.0.)
In recognition of the interrelationship between the right of owners of residential property to continue to receive rents and their obligation to maintain the buildings and render services, section 755 of the Real Property Actions and Procedures Law was enacted which permits tenants of residential properties, under certain circumstances, to continue to retain possession of their apartments and deposit their rents in court, until corrective measures are taken where there has been a finding that the owner has net maintained the building in accordance with prescribed standards. Similarly, section 302-a of the Multiple Dwelling Law precludes the receipt of rents by owners where rent impairing violations have not been removed for a period of six months or more.
The purpose of these statutory enactments was to require a landlord to maintain decent housing. (Morbeth Realty Corp. v Velez, 73 Misc 2d 996; 107 East 123rd Street Corp. v Flores, 65 Misc 2d 130.)
In 176 East 123rd St. Corp. v Frangen (67 Misc 2d 281, 285) the court, recognizing that the purpose of these statutes is to restore the property to habitable conditions, said: "In order * * * to induce the landlord to make repairs the tenant is required to create a fund in the court’s possession which will be delivered to the landlord when his property again becomes habitable.”
This entire scheme of personal responsibility for the maintenance of residential buildings and the furnishing of essential services would be frustrated and rendered ineffective if a *88 court, even indirectly, gave judicial approval, to the attempt by an order to evade this responsibility by leaving or "walking away” from a building where there are numerous violations and services are not being furnished.
Yet, that would be the net result of a court order directing the HDA to vacate a building because the landlord has failed to correct and cure violations and furnish services.
In spite of the broad and salutary purposes for which the Housing Court was created, this court cannot and should not become involved in the basic determination as to whether or not buildings meet the criterion of being "unfit for human habitation,” and substitute its judgment for the decision of the administrative agencies having jurisdiction and responsibility, and direct the city, through its designated agencies, to step in and vacate a particular building.
Particularly, here, where we are dealing with a block on the traditional Lower East Side of the City of New York, on which there has not as yet commenced any substantial trend towards abandonment, it would be most unwise and inappropriate for this court itself to take a step which might initiate such a trend.
Conferences with representatives of community organizations and personal inspection by this court established that the block on which the subject building is located does not as yet have any abandoned buildings.
This court, and every official involved with the housing situation in the City of New York knows the dire consequences which can be generated by a forced abandonment of a building with the resultant boarding up of windows, inviting vandals, and generally insuring a rapid deterioration not only of the subject building but adjacent and neighboring buildings and blocks and entire neighborhoods.
Accordingly, this court was most reluctant to proceed with an order directing HDA to vacate this building.
Instead, as indicated, the court met with representatives of HDA and representatives of community organizations.
One such conference was held in the office of HDA Deputy Commissioner Weiner, where a plan was agreed upon under which 204-06 Clinton Street would be the subject of a proceeding for the appointment of a receiver pursuant to section 309 of the Multiple Dwelling Law. This court has been informed that the receiver to be recommended will be one of the *89 community organizations, with the hope that funds may become available, to rehabilitate present vacant apartments in the subject building and make this building viable and inhabited rather than desolate, abandoned, boarded up and uninhabited.
The instant motion for the appointment of a receiver followed upon that meeting and conference.
Accordingly, the court declines to sign the orders directing HDA to vacate the building heretofore submitted; and the court does hereby grant the pending motion for the appointment of a receiver brought on by the said order to show cause dated April 1, 1975.