MILDRED MANGAN, Special Adm'r of the Estate of Catherine Mangan, Deceased, Plaintiff-Appellee, *v.* F. C. PILGRIM & COMPANY, Defendant-Appellant.

(No. 59814;

First District (4th Division)—September 24, 1975.

564

Richard F. Mack, of Chicago (Francis W. Gulbranson and Neal Wishnick, of counsel), for appellant.

Donald A. Carr, of Carr & O'Rourke Associates, of Chicago, for appellee.

Mr. JUSTICE BURMAN delivered the opinion of the court:

This is an appeal from a judgment for plaintiff for personal injuries to Catherine Mangan, who allegedly fell as a result of encountering a mouse in her apartment.

The action was originally brought by Catherine Mangan herself against Herbert J. Johnson, owner of the apartment building, in which she resided, F. C. Pilgrim & Company (Pilgrim), which managed the building, and Edward Melone, a janitor in the building. While the action was pending, Catherine Mangan died and her daughter-in-law, Mildred Mangan, was appointed special administrator of the Estate of Catherine Mangan. Herbert J. Johnson also died during the pendency of the suit and Donald Messinger was appointed special administrator of his estate. Edward Melone was never served with summons and was dismissed during the trial. The jury returned a verdict in the sum of $20,000 against Donald Messinger as special administrator of the estate of Herbert J. Johnson, and further found no liability on the part of F. C. Pilgrim & Company. The estate of Herbert J. Johnson by Donald Messinger as special administrator prosecutes this appeal from the judgment entered on the jury verdict and from the order denying the defendant's post-trial motion.

The record discloses the following pertinent facts and testimony: On January 31, 1968, Catherine Mangan, 83 years of age and in good health, resided alone in a four-room ground-floor apartment in the subject building located in Oak Park, Illinois. The building housed 38 apartments,

was owned by Herbert J. Johnson, and was managed by F. C. Pilgrim & Company.

At about 4 p.m. on the above date, Catherine Mangan was visited by her daughter-in-law, Mildred Mangan, who was a registered nurse. Mildred Mangan testified at trial that she stayed about 30 minutes before leaving and that her mother-in-law appeared fine. Later that same day she tried to telephone Catherine, but received no answer, which was unusual. She thereupon called the lady who lived upstairs from her mother-in-law and was told by her that she had "heard moaning down there." Mildred responded that they would be "right over." Mildred, her husband, Edward Mangan, and her two daughters by a previous marriage, Bernadette and Mary Beth, thereupon drove to Catherine Mangan's apartment, arriving some time after 7 p.m. Upon arrival, Edward Mangan, who had a key, attempted to open the door, but could not, because Catherine Mangan's body was immediately inside the door lying against it. They pushed the door open enough for Bernadette to gain entry. At this time Edward Mangan exclaimed "My God, Mom, what happened to you?" Catherine replied, "A mouse jumped out of the oven, and I fell." Mildred Mangan further testified that Catherine's right arm and right leg had friction burns on them, and the left leg was "turned out." An ambulance was summoned and Catherine was taken to the hospital where she remained for over two months. She died in December of 1971.

On cross-examination Mildred Mangan testified that her mother-in-law was moaning and crying when they arrived. She told them that she went to take biscuits out of the oven and when she opened the door, the mouse jumped out. Mildred "observed the oven door open and the biscuits there and her supper was simmering on the stove." Mildred recalled seeing mice on the property but could not say exactly how many times.

Mary Beth Wojcik, Mildred Mangan's daughter by a previous marriage, testified that she accompanied her mother, her stepfather Edward Mangan, and her sister Bernadette to Catherine Mangan's apartment on the evening of January 31, 1968. She essentially corroborated her mother's testimony that Catherine was lying inside in front of the door when they arrived, that her sister Bernadette squeezed through to open it and that her "stepfather was real excited and nervous" and said to his mother Catherine "What happened to you?" Catherine, who was also "excited" and "in pain" replied that she had been frightened by a mouse and fell.

Doctor George J. Hallenbeck, a physician and surgeon, testified that he saw Catherine on the evening of her injury. Her history was first taken by an intern, but he testified that he would also "take my own histories

and * * * review the intern's to see whether or not we differ or not. If no difference, I sign it." He reviewed Catherine Mangan's history and confirmed and approved it. According to the report as testified to by Doctor Hallenbeck, she complained of pain in the hip and had stated "that while at home she saw a mouse in the kitchen. It frightened her and she fell on her left side injuring her hip. * * *" X-rays were taken under his direction and indicated a fracture of the left hip. He operated on her on February 2, 1968, making an 8- to 10-inch incision in the left leg, placing the bones in proximity to one another, and then inserting a Frederick's pin affixed by a special plate screwed to the pin.

Mabel Judy was living in an apartment on the second floor of the subject building at the time of Catherine Mangan's injury. She testified she heard rustling noises in the walls and had seen a mouse in one of the other tenant's traps.

Maureen Halpin testified that she had lived in the same apartment building on the third floor until September of 1967. She said that there was one receptacle or chute for garbage for the two apartments on each floor. There were no restrictions on the type of garbage that would go into the chute. Raw garbage would descend in the chute to the basement, where it was burned. When she would from time to time carry larger bundles of garbage to the basement receptacle itself, she saw mice. This occurred many times. She complained to the janitor several times, and, although she wasn't sure, probably also to Pilgrim & Company. She also found mice in her apartment and she and her husband set traps and caught them regularly. She once observed a mouse on her stove and once in her refrigerator. She made further complaints and every month or so two men would come and put pellets down in her apartment. No change in the condition of her apartment was apparent, however, due to their efforts.

Norine Berk resided in the apartment building on the first floor from June 1964 until May 1972. Mrs. Mangan lived directly across from her. Each two apartments had incinerators outside their back doors for disposal of garbage. She always kept lights on in her apartment because she had a serious mouse problem. She saw mice on several occasions and mouse excrement at other times, and also heard noises in the wall. On one occasion she saw Catherine Mangan dispose of a mouse in the incinerator. She complained to the janitor first, then to Pilgrim about once a month. Mr. Johnson was also called by her and told about it. After the incinerators were turned off and professional exterminators were hired, she did not have that great a problem any more. It appeared to her that the improvement came after Mrs. Mangan's injury, however.

Gina Bendola, called by plaintiff as an adverse witness, testified that

she was a secretary at F. C. Pilgrim & Company, and that the company's duties were to handle the affairs of each building for the owner, collect rents, pay bills, pay the janitors, take care of complaints, and hire repairmen. She personally remembered receiving a complaint over the telephone from Mrs. Mangan in the fall of 1967 about mice in the subject building, and also one from Miss Berk. Exterminators were hired to remedy the situation. She reviewed reports of Pilgrim showing expenditures for the subject building. One statement indicated that the building was "owner occupied," *i.e.*, Herbert J. Johnson lived in the building.

Defendants presented as a witness Richard Lenz, vice president of Charles Lenz Company, a scavenger service which serviced the subject building. He testified that the janitor would carry the garbage from each flat down to the basement and put it in the incinerator and burn it, and his company visited the building about once a week to carry out the incinerator ash. It appeared to him that the basement was neat and clean, but he did not know anything about the rest of the building.

George Hoffman testified for defendants that he was an exterminator hired by F. C. Pilgrim & Company to service the subject building. He employed and instructed one Jim Dugan to service the building. Dugan would visit the building once a month and ask tenants who answered the door whether they had a problem. If so, he would lay down poison or traps. On cross-examination Hoffman testified that garbage is considered a breeding place for mice, and that mice multiply rapidly. He said that traps do not rid a place of all the mice, but only catch those that are around.

Lawrence Dugan testified that he would accompany his father, Jim Dugan, in servicing buildings as an exterminator. He said that they received complaints about mice in October of 1967 at the subject building. His father would leave poison and set traps for those tenants who were home and had a problem.

■■ The defendant argues first that no cause of action exists for the alleged injuries to Catherine Mangan, because the facts do not establish that defendant's deceased owed her any duty. After summarizing counts I and II of plaintiff's complaint (count III based on nuisance was never submitted to the jury), defendant argues that a landlord ordinarily owes no duty to a tenant to make any repairs for any defects unless he agrees to do so by the terms of some express covenant or agreement. (*Forshey v. Johnston*, 132 Ill.App.2d 1106, 271 N.E.2d 81.) An exception exists where there are latent defects of which the landlord either has knowledge or is chargeable with knowledge, in which case he has a duty to disclose them (*Thorson v. Aronson*, 122 Ill.App.2d 156, 258 N.E.2d 33;

24 Ill. L. & Pr. *Landlord and Tenant* § 302 (1956)), but defendant notes that no hidden defect is alleged by plaintiff here.

We agree with these general propositions of law, but concur with the plaintiff that the allegation of an unsafe condition in the case at bar relates initially at least to areas of the building under common control (*e.g.*, the incinerator system and walls). It is alleged in Count I that defendants "owed a duty to the deceased and others lawfully upon the premises to so operate, manage, maintain and control those parts of the premises over which they retained control so as to avoid injury to the persons lawfully on said premises, including the deceased, Catherine Mangan, and that defendants "carelessly and negligently caused ·and permitted certain areas of the said building which remained under the control and responsibility of the Defendants, to become and remain infested with, or inhabited by, mice and other vermin  *  *  *.'' It is established that where a portion of the premises is reserved for common use and is under the landlord's control, a duty is imposed upon him to use ordinary care to keep such portion in a safe condition. (*Loveless v. Warner*, 37 Ill.App.2d 204, 185 N.E.2d 392; 24 Ill. L. & Pr. *Landlord and Tenant* § 302 (1956); Restatement (Second) of Torts § 360 (1965).) The fact that the actual injury occurred on the demised premises should make no difference if the cause of the injury was the landlord's negligent maintenance of a common area. (See *Ciskoski v. Michalsen*, 19 Ill.App. 2d 327, 152 N.E.2d 479; *Myrick v. Herrmann*, 17 Ill.App.2d 301, 149 N.E. 2d 792.) Furthermore count II of the complaint alleges negligence on the part of the defendants in failing to fulfill the duty imposed by certain provisions of an ordinance of the Village of Oak Park prohibiting rodent infestation. (Village of Oak Park, Illinois, Housing Code §§ 78—16, 78— 18, June 2, 1958.) The violation of a statute or ordinance prescribing a duty for the protection and safety of persons or property may constitute negligence such as gives rise to a cause of action on behalf of a person who suffers injury or damage by reason thereof (subject to certain other conditions to be discussed *infra*). 28 Ill. L. & Pr. *Negligence* § 31 (1957).

■■ The defendant further contends, in the same context as his duty argument, that the injuries sustained by Mrs. Mangan as a result of Herbert Johnson's alleged negligence were not foreseeable and were too remote to support a cause of action. This, of course, involves us in the much discussed problem of determining the scope of the foreseeable risk involved in a negligent act. See generally *Palsgraf v. Long Island R.R. Co.* (1928), 248 N.Y. 339, 162 N.E. 99; Prosser on Torts, ch. 7, § 43 (4th ed. 1971).

Although the element of foreseeability, essential to a finding of liability

for negligence, has been dealt with from the aspect of "duty" (see Palsgraf and Prosser cited above), it has also, and more traditionally, been approached from the standpoint of "proximate cause." In Illinois, for example, it has often been stated that for the requirement of proximate cause to be fulfilled, an injury must be the natural and probable consequence of a negligent act or omission. (*Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 79, 117 N.E.2d 74, 78-79.) This test includes a consideration of whether the injury is a consequence of the negligent act or omission which human foresight could anticipate, *i.e.*, whether the injury was foreseeable. (2 Ill.2d at 79, 117 N.E.2d at 79; see also 28 Ill. L. & Pr. *Negligence* § 105 (1957).) It has also been stated that where it could have been reasonably foreseen that some injury might result from the negligent act or omission complained of, it is not essential that the precise consequences which actually resulted therefrom should have been foreseen. See *Blue v. St. Clair Country Club*, 7 Ill.2d 359, 131 N.E.2d 31; *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74; 28 Ill. L. & Pr. *Negligence* § 105 (1957).

■■ The gist of the plaintiff's allegation of negligence in count I is that the defendants permitted the apartment building to become infested with mice and/or failed to adequately rid the building of them. The question is whether as a result of this alleged negligent conduct defendant could be held liable for plaintiff's fall and consequent injury under the applicable tests of forseeability. We feel that he could. The presence of the rodents gave rise to a variety of reasonably foreseeable risks of harm to occupants or visitors in the building. The spread of disease or bites might be a couple of commonly foreseeable risks. But it is not uncommon for any woman, let alone an 83-year-old woman living alone, to be startled or frightened by the unexpected appearance of a rodent, especially as revealed by the circumstances of this case. As indicated in *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74, whether a defendant's conduct is to be considered a proximate cause of the injury is generally a question to be determined by the trier of the facts. The circumstances of the occurrence revealed by the record create a sufficient enough issue regarding proximate cause for the court to have submitted the question to the jury for a factual determination. The jury was instructed regarding proximate cause. We are of the opinion that the jury could properly find, as they did, that there was sufficient nexus between the negligent act and the injury to impose liability on the defendant.

A separate but related issue is posed with reference to count II of plaintiff's complaint, which is based on the defendant's alleged violation of the Village of Oak Park Housing Code prohibiting rodent infestation

of dwelling units and accompanying buildings. The portions of the Code ultimately relied upon by plaintiff provide as follows:

"78—16. General Requirements Relative to the Safe and Sanitary Maintenance of Parts of Dwellings and Dwelling Units. No person shall occupy as owner-occupant or let to another for occupancy and no owner shall suffer or permit any person to occupy, any dwelling or dwelling unit for the purpose of living, sleeping, cooking or eating therein, or rooming unit for the purpose of living or sleeping therein, which does not comply with the following minimum requirements.

(a) Every foundation, floor, wall, ceiling and roof shall be reasonably weathertight, watertight and rodent-proof; shall be capable of affording privacy; and shall be well-maintained and kept in good condition and repair.

(b) Every window, exterior door and basement hatchway shall be reasonably weathertight, watertight, and rodent-proof; and shall be kept in good repair.

\* \* \*

78—18. Additional Responsibilities of Owners and Occupants.

(a) Every occupant of a dwelling unit or rooming unit, shall keep that part of the dwelling, dwelling unit, rooming unit, yards, courts, garages and accessory buildings which he occupies or over which he has exclusive possession and right of control in a safe and sanitary condition, clear and free from any accumulation of dirt, filth, junk, rubbish, garbage or similar matter, from vermin or rodent infestation, and from materials or conditions of maintenance which tend to encourage or support such infestation or such accumulations.

\* \* \*

(c) Except as it may be the responsibility of every occupant under sub-section (a) of this Section, every owner shall keep the building, yards, courts, garages and accessory buildings in a safe and sanitary condition, clean and free from any accumulation of dirt, filth, junk, rubbish, garbage or similar matter, from vermin or rodent infestation, and from materials or conditions of maintenance which tend to encourage or support such infestion or such accumulations.

(d) Every occupant of a dwelling containing a single dwelling unit shall be responsible for the extermination of any insects, rodents, or other pests therein or on the premises, and every occupant of a dwelling unit in a dwelling containing more than one dwelling unit shall be responsible for such extermination when-

ever his dwelling unit is the one infested. Notwithstanding the foregoing provisions of this subsection, whenever infestation is caused by failure of the owner to maintain a dwelling in rodent-proof or reasonably insect-proof condition, extermination shall be the responsibility of the owner. Whenever infestation exists in 2 or more of the dwelling units in any dwelling, or in the shared or public parts of any dwelling containing 2 or more dwelling units, extermination thereof shall be the responsibility of the owner."

As we stated earlier, the violation of a statute or ordinance may provide the basis for a finding of negligence. (See generally 28 Ill. L. & Pr. *Negligence* § 31 (1957).) But it is generally required that the plaintiff be within the class of persons intended to be protected by the particular statute or ordinance, and that the plaintiff's harm be of the kind which the statute or ordinance was intended in general, to prevent. (Prosser on Torts, ch. 5, § 36, at 190 *et seq.* (4th ed. 1971); Restatement (Second) of Torts § 286 (1965).) Again, Illinois has often dealt with the problem in terms of proximate cause (see *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74), with the additional requirement that plaintiff "come within the purview" of the particular ordinance or statute. (See *Dini v. Naiditch*, 20 Ill.2d 406, 170 N.E.2d 881; *Horcher v. Geurin*, 94 Ill.App.2d 244, 236 N.E.2d 576.

■ We have no hesitation in holding that plaintiff's deceased, as a resident of the building owned by the defendant, clearly was within the class of persons intended to be protected by the village ordinance requiring "Safe and Sanitary Maintenance \* \* \* of Dwellings and Dwelling Units," and imposing certain specific responsibilities on the owners thereof, and in this respect comes within the purview of the ordinance. In determining whether the type of harm suffered by her was intended to be protected against by the ordinance, we must again indicate that the presence of rodents in a dwelling gives rise to an array of foreseeable dangers. Abatement of the general threat of unsanitary and unsafe conditions caused by the presence of such creatures was no doubt the essential consideration of the village in enacting the ordinance. The harm suffered here can validly be considered of a kind which the ordinance was intended, in general, to prevent. (See Prosser on Torts, ch. 5, § 36, at 195 (4th ed. 1971).) And again, the jury was presented with sufficient evidence to make a determination based on the instructions given that the alleged violation of the ordinance by defendant proximately caused Catherine Mangan's injury. (*Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 117 N.E.2d 74.)

Defendant makes a further contention in passing that counts I and II of plaintiff's complaint did not contain separate causes of action upon

which separate recoveries could be had, as required by section 33(2) of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 33(2)), and that therefore one or the other should have been stricken, citing *Litow v. Aurora Beacon News*, 61 Ill.App.2d 127, 209 N.E.2d 668. *Litow*, in which the court found the crux of two separate counts in plaintiff's complaint to be an alleged breach of the same implied contract and suggested that one be dismissed, is clearly not parallel to the instant case, where allegations of negligence are made in count I based on defendant's deceased's general duty as a landlord, and in count II based on a violation of the village ordinances. In any event, it is well settled that where a complaint is sufficient to state a cause of action (and no contrary contention is made here), defects in form are cured by verdict. *Boker v. Boker*, 17 Ill.App.2d 260, 149 N.E.2d 774.

Objection is next made on appeal to the trial court's refusal to exclude certain testimony of two witnesses, Mildred Mangan and Mary Beth Wojcik. Both testified as indicated above, as to what Catherine Mangan told them caused her to fall. There were no eyewitnesses to the occurrence. The trial court admitted the testimony under the spontaneous declaration or excited utterance exception to the hearsay rule, and the defendant takes issue with the propriety of that determination.

Three factors, as instructively set out by the Illinois Supreme Court in *People v. Poland*, 22 Ill.2d 175, 174 N.E.2d 804, are necessary to bring a statement within this exception to the hearsay rule. They are "(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." (22 Ill.2d 175, 181, 174 N.E.2d 804, 807.) The second factor poses the only apparent problem with the subject testimony. The defendant argues that, since the declaration of Catherine Mangan testified to was not made contemporaneously with the occurrence and there is no indication as to how much time elapsed after her fall before it was made, permitting the testimony was improper. He emphasizes that the declaration was an unspontaneous narrative of a past event and was made in response to an inquiry as to what happened.

The basis of the rule in regard to spontaneous or excited utterances, as with other exceptions to hearsay, is that the statement must be made under circumstances calculated to give some special trustworthiness to it. (VI Wigmore on Evidence § 1749 (3rd ed. 1940).) There is no need that the declaration be strictly contemporaneous with the exciting stimulus in order to fulfill the "absence of time to fabricate" requirement; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. (VI Wigmore on Evi-

dence §§ 1750, 1756 (3rd. ed. 1940).) Furthermore the question of admissibility is one of administration, each case being properly decided on its own facts; and in this regard the trial court should be clothed with a reasonable degree of latitude, since the application of the principle depends on the circumstances of the particular case (*Johnson v. Swords Co.*, 286 Ill.App. 377, 380, 3 N.E.2d 705, 706), especially in regard to consideration of the time lapse between the startling event and the utterance. See VI Wigmore on Evidence § 1750, at 154 (3rd ed. 1940).

In the case at bar it is unclear as to exactly how much time elapsed between Mrs. Mangan's fall upon seeing the mouse and her statement upon the arrival of her son and daughter-in-law. Mildred Mangan had visited her mother-in-law at her apartment earlier in the day on January 31, 1968, and had left about 5 p.m. About 7 p.m. Mildred tried to call her mother-in-law at home and received no response. She called an upstairs neighbor who reported that she had "heard moaning down there." Thereupon Mildred and her husband and two daughters immediately drove to Catherine Mangan's apartment. Although it is highly probable that the family arrived at least some minutes after the accident (considering as a minimum the time it took to drive from their home to Catherine Mangan's apartment), it is not unlikely that they arrived shortly thereafter. Mildred Mangan testified under cross-examination that at the time they found her mother-in-law, the biscuits she said she had reached for in the oven when the mouse jumped out were lying on the open oven door. The oven heat had been turned off and the biscuits were not hot, but food was still simmering on the gas burners on top of the stove.

■■ More importantly, however, the overall circumstances lend trustworthiness to Catherine Mangan's statements. She was 83 years old and alone in her apartment when she fell. Surely whatever stress and excitement was initially generated by that event continued even more acutely while during the ensuing minutes she was incapacitated, and in pain. When her family arrived she was still lying against the door, "excited," and justifiably so. These circumstances are indicative of neither an opportunity nor a purpose for fabrication. Moreover, the deceased's statement to her relatives upon their arrival would surely have been made without any prompting in the form of a question. The circumstances themselves required some informative utterance by her. Any inquiry was superfluous. Under the circumstances here and based on the principles of law heretofore set out, we are not persuaded to upset the trial court's determination that her statement fulfilled the requirements of admissibility under the excited utterance exception to the hearsay rule.

Objection is next made by the defendant to the trial court's decision

to allow the treating physician, Doctor George J. Hallenbeck, to testify from a written hospital report that "while at home she [Catherine Mangan] saw a mouse in the kitchen. It frightened her and she fell on her left side injuring her hip." Defendant argues that the medical history contained in the report was not actually recorded by Doctor Hallenbeck, and consequently that there was insufficient foundation to allow him to testify regarding it, and further, that in any event the statement in the report revealing how Mrs. Mangan fell would be admissible only for the purpose of showing a causal connection between the occurrence complained of and the injury and not for the purpose of showing how she was in fact injured.

■■ Since we have held immediately above that the other evidence that plaintiff's deceased fell when she saw a mouse jump out of her oven was properly admitted, the Doctor's testimony as to that fact was corroborative and cumulative. We therefore hold that even assuming *arguendo* its admission was improper, it was not prejudicial. (*Greinke v. Chicago City Ry. Co.*, 234 Ill. 564, 85 N.E. 327.) We note also that defendant made only a general objection at trial to admission of this testimony, the court apparently construing that general objection as being related to whether a proper foundation had been laid to show that Doctor Hallenbeck was actually the treating physician. It is well established that for sound policy reasons a general objection is ordinarily not sufficient to preserve for review more specific objections not raised in the trial court. (See generally 2 Ill. L. & Pr. *Appeal and Error* § 258 (1953), and cases cited therein.) Furthermore, no mention of Doctor Hallenbeck's testimony is made in defendant's post-trial motion, and a litigant is ordinarily precluded from raising on appeal those matters not raised in the post-trial motion. *Freeman v. Chicago Transit Authority*, 33 Ill.2d 103, 210 N.E.2d 191.

The defendant also argues on appeal, without citation of case authority, that both the testimony of Mildred Mangan and Mary Beth Wojcik, and that of Doctor Hallenbeck, should have additionally been excluded as a violation of the Illinois "Dead Man's Act." (Ill. Rev. Stat. 1971, ch. 51, par. 2.) No objection was made, either during trial in the context of the complained of testimony, or in the post-trial motion at all, based upon that ground, and, applying the rules set forth above, defendant has waived a consideration of this issue on appeal.

It is next contended generally that the verdict below was contrary to the law and manifest weight of the evidence. Defendant's initial argument in this respect,—that only incompetent evidence was offered to prove how Mrs. Mangan's fall occurred—is obviated by our holding above that there was competent evidence on that point. It is further

asserted that plaintiff's proof of Catherine Mangan's freedom from contributory negligence (plaintiff's burden under Illinois law) was circumstantial and insufficient, and that plaintiff's evidence of defendant's deceased's negligence in maintaining the premises so as to cause or create the condition leading to the injury was likewise insufficient. We hold otherwise.

The record reveals testimony by a neighbor, Norine Berk, and by Mildred Mangan, as to the careful habits of Catherine Mangan, *e.g.*, in walking and housecleaning, in spite of her advanced age. Under the circumstances, where direct evidence was unavailable, habit evidence was admissible and probative as to her lack of contributory negligence. (See *Hughes v. Wabash R.R. Co.*, 342 Ill.App. 159, 95 N.E.2d 735.) The jury could therefore properly find based on evidence of habit, as it did, that Catherine Mangan did not legally contribute to her injury so as to preclude plaintiff's recovery. Although the evidence was circumstantial, it was not legally insufficient to support the verdict.

■■ Evidence of defendant's deceased's negligence was also sufficient to support a verdict for plaintiff. It was revealed through testimony that a long-standing rodent problem did indeed exist in the building. Other testimony tied the problem to the incinerator system and garbage area. Exterminating efforts by the defendants were also detailed by various witnesses, and could legitimately be deemed by the jury insufficient to adequately relieve the problem. Moreover, the foregoing evidence indicates defendant's deceased's failure to fulfill the responsibilities imposed upon him as owner by the Oak Park ordinance, and as such provided another basis for the jury's finding of negligence.

The defendant next makes other allegations of error involving the portions of the Oak Park ordinance relied upon by plaintiff (Village of Oak Park, Illinois, Housing Code §§ 78—16(a)(b), 78—18(a)(c)(d), June 2, 1958, set out above), which were received in evidence and included in instructions to the jury. The first of these allegations—that the ordinance was not intended to protect persons in the class of Catherine Mangan against the type of injury sustained by her—we have already considered above and rejected.

■■ It is further argued, however, that instructions should have a reasonable basis in the evidence before being tendered to the jury, and that the instructions embodying the sections of the ordinance in the case at bar were prolix and not justified nor supported by the evidence. We disagree. Testimony indicated that the defendant's deceased as owner may have failed to comply with various requirements imposed by the ordinance, *e.g.*, keeping walls and basements rodent-proof (§ 78—16(a) and

(b)), keeping the building free from rodent infestation and materials or conditions of maintenance which tend to encourage or support such infestation, where such is not the responsibility of the occupant (§ 78—18(c)), and exterminating when infestation exists (§ 78—18(d)). The applicability of the sections of the ordinance relied upon was clearly and sufficiently established by the evidence.

The defendant finally argues concerning the provisions of the ordinance that they should not have been incorporated into two separate instructions, and that the court, by reiterating them in this way, influenced the jury as to their importance. We acknowledge that the ordinance provisions were set out in the issues instruction to the jury (IPI No. 20.01.01), and also in an instruction charging specifically a violation of the ordinance as negligence (IPI No. 60.01). But we fail to see how this could have influenced the jury's decision and amounted to reversible error. It has been stated in *Signa v. Alluri*, 351 Ill.App. 11, 113 N.E.2d 475, as pointed out by defendant, that an issues instruction should summarize the pleadings concisely without characterization, repetition or undue influence. But in that case the court reversed where a long issues instruction time after time repeated and emphasized plaintiff's charges of defendant's "conscious indifference" and wilful and wanton behavior. In *Baker v. Thompson*, 337 Ill.App. 327, 85 N.E.2d 924, also cited by defendant, a reversal was mandated where in seven different instances in defendant's instructions the jury was told in some form that plaintiff must be free from contributory negligence and that plaintiff had to prove her case by a preponderance of the evidence, and in 14 different instances repeated the phrases "You must find the defendant not guilty" or "the plaintiff cannot recover." These cases are patently dissimilar on the facts and in no way justify a reversal in the case at bar. We accordingly refuse to grant one.

The defendant finally contends in this appeal that the verdict finding Herbert J. Johnson, the owner of the building, guilty of negligence, and F. C. Pilgrim & Company, the managing agent of the premises, not guilty, was inconsistent and clearly the result of improper instructions and the ordinance submitted to the jury. We have held above that the ordinance provisions and the instructions embodying them were properly submitted to the jury, and the applicable responsibilities imposed by the ordinance provisions rest upon the owner of the premises. This could clearly justify the verdict rendered. Furthermore, there is evidence that defendant's deceased, Herbert J. Johnson, himself resided in the subject building when the injury occurred and for a considerable period of time before then, and may have personally had notice of the rodent problem.

578

Thus his liability may have been established without regard to any agency relationship between him and Pilgrim for his own failure to prevent and/or remedy the condition which existed.

For the above reasons, the judgment of the circuit court is affirmed.

Affirmed.

ADESKO and JOHNSON, JJ., concur.