VEMBA DAPKUNAS, Plaintiff-Appellant, *v.* BONNIE CAGLE, Defendant-Appellee.

Fifth District No. 75-351

Opinion filed September 20, 1976.

G. J. MORAN, J., dissenting.

Harris and Lambert, of Marion, for appellant.

James B. Bleyer, of Marion, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiff brought suit for personal injuries which allegedly occurred when she fell from the back steps of a home she had rented from defendant. Plaintiff's fifth amended complaint was dismissed for failure to state a cause of action, and judgment was entered in favor of defendant. Plaintiff appeals.

Plaintiff's fifth amended complaint contained two counts. The first count alleged that defendant owned a frame house in Johnston City, Illinois; that prior to August 13, 1969, plaintiff and defendant entered into a "verbal lease" of the house on a month-to-month basis; that plaintiff rented the house to use it as a dwelling; that in the back yard of the house were clothesline posts and clotheslines; that the back steps were made of concrete blocks and bricks which were not fastened together and which were laid loosely and were narrow and unstable; that the back entranceway was the only entranceway in close proximity to the clothesline; that at the time plaintiff rented the house defendant knew or should have known that plaintiff would use the clothesline and that plaintiff would use the back steps to carry clothes to the clothesline; that defendant had a duty to make necessary repairs to the house including the rear entranceway and steps; that defendant was negligent in that she failed to repair the loose and unsecure back steps and to install proper steps; that on August 13, 1969, plaintiff fell and sustained injuries when the back steps tumbled as she was carrying a basket of clothes over them; that immediately thereafter defendant purchased and installed precast concrete steps at the back entrance of the house; and that prior to August 13, 1969, plaintiff had attempted to find other available and suitable housing but was unable to do so because of the unavailability of such housing and because of her inability to pay an amount of rent greater than the $50 per month which she paid defendant.

The second count of plaintiff's fifth amended complaint alleged the same facts but in place of negligence substituted as the grounds for liability "that the defendant impliedly warranted to the habitability and fitness for its intended use of the furnished dwelling at the time she rented it to the plaintiff."

Two questions are presented for review: (1) whether plaintiff's fifth amended complaint alleges sufficient facts to state a cause of action for recovery under established tort law for injuries sustained during the fall from the steps; and (2) whether the fifth amended complaint states a

cause of action for recovery for personal injuries under a theory of an implied warranty of habitability and fitness for intended purpose of a leased residential house. We answer both questions in the negative and accordingly affirm.

■■■ In *Thorson v. Aronson*, 122 Ill. App. 2d 156, 258 N.E.2d 33, the court noted that as a general rule of law, subject to a few exceptions, a landlord is not liable for injuries occurring on premises leased to a tenant and under the tenant's control. The court pointed out that the exceptions are:

"(1) where a latent defect exists at the time of the leasing, which defect is known or should have been known to the landlord in the exercise of reasonable care and which could not have been discovered upon a reasonable examination of the premises by the tenant; (2) where the landlord fraudulently conceals from the tenant a known, dangerous condition; (3) where the defect causing the harm, in the law, amounts to a nuisance; and (4) where the landlord promises the tenant to repair the premises at the time of the leasing." (122 Ill. App. 2d 156, 160, 258 N.E.2d 33, 34-35.)

In accord with this statement of the law is *Looger v. Reynolds*, 25 Ill. App. 3d 1042, 324 N.E.2d 238, which, in expanding on the fourth exception noted above, adopted the following rule from the Restatement (Second) of Torts (1965):

"A lessor of land is subject to liability for physical harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession if

(a) the lessor, as such, has contracted by a covenant in the lease or otherwise to keep the land in repair, and

(b) the disrepair creates an unreasonable risk * * * and

(c) the lessor fails to exercise reasonable care to perform his contract." 2 Restatement (Second) of Torts §357 (1965).

■■ We note that the court in *Mangan v. F. C. Pilgrim & Co.*, 32 Ill. App. 3d 563, 336 N.E.2d 374, recognized that an additional exception to the general rule may exist in cases where an injury to a tenant results from a violation of a statute or ordinance by the landlord. The court stated:

"The violation of a statute or ordinance prescribing a duty for the protection and safety of persons or property may constitute negligence such as gives rise to a cause of action on behalf of a person who suffers injury or damage by reason thereof * * * .

* * *

But it is generally required [for recovery] that the plaintiff be within the class of persons intended to be protected by the

particular statute or ordinance, and that the plaintiff's harm be of the kind which the statute or ordinance was intended in general, to prevent." 32 Ill. App. 3d 563, 569, 572, 336 N.E.2d 374, 379, 381.

■■ In the instant case the allegations of the fifth amended complaint do not bring plaintiff under any of the exceptions to the general rule noted above. The complaint alleged only a defect that could have been easily discovered by plaintiff upon a reasonable inspection. Furthermore, the complaint contained no allegation of a fraudulent concealment by the landlord; a defect amounting to a nuisance; a promise by the landlord to repair; or a violation of a statute or ordinance. Therefore, since the leased premises were under the exclusive control of plaintiff, the general rule stated above should apply.

■■ Plaintiff, however, states that courts in other jurisdictions have adopted a rule of law different from the established law in this State. Specifically, plaintiff refers to *Sargent v. Ross* (1973), 113 N.H. 388, 308 A.2d 528, 64 A.L.R.3d 329, and *Brennan v. Cockrell Investments, Inc.* (1973), 35 Cal. App. 3d 796, 111 Cal. Rptr. 122, in which the courts held that a standard of reasonable care should apply in all landlord and tenant cases, without concern over which party had control over the area where the injury occurred. Plaintiff has not drawn our attention to any Illinois cases that have adopted this or a similar standard, and we are not convinced that the case before us is one requiring a departure from the well-established law of this State. Accordingly, we find no error with respect to the dismissal of the first count of plaintiff's fifth amended complaint.

■■ In the second count of plaintiff's fifth amended complaint, plaintiff sought to recover under a theory that defendant had breached an implied warranty of habitability and fitness for intended use of a dwelling. In support of her argument that a cause of action was stated in this count of the complaint, plaintiff cites *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351, 280 N.E.2d 208, and other cases which have held an implied warranty of habitability applicable in certain landlord and tenant situations. We feel, however, that for a number of reasons neither *Jack Spring* nor any of the other cases cited by plaintiff are authority for allowing plaintiff to recover under an implied warranty theory for the personal injuries she allegedly sustained.

First of all, *Jack Spring*, unlike the instant case, involved multiple-unit dwelling situations, and the applicability of the court's ruling was expressly limited to such situations. As the court stated in *Jack Spring*, "[This case] is applicable only to the factual situations here presented, the occupancy of multiple dwelling units." (50 Ill. 2d 351, 367, 280 N.E.2d 208, 218.) Although the opinion of the court did not elaborate on this statement or express the reasons underlying the strict limitation, at least

two reasons for the limitation are apparent. First, in a single-unit dwelling the tenant has exclusive possession of the building, or housing unit. However, in a multiple-unit dwelling, the tenant has exclusive possession only of the space occupied by his individual apartment. He does not have exclusive possession of the entire building, of the common passageways, or of the space occupied by the other apartments. This distinction is of particular significance especially with respect to conditions in the housing unit needing repair which, without the maintenance or repair, would seriously threaten personal health or safety. If the burden of maintenance and repair is placed upon the tenant in a single-unit dwelling and he fails to perform the necessary maintenance or repair in such situations, most likely only the health and safety of the tenant or those in his dwelling will be threatened. In contrast, however, if the same burden is placed upon the tenant in a multiple-unit dwelling and he fails to perform the necessary maintenance or repair, most likely the health and safety of persons in other apartments or other areas of the building will also be threatened. Therefore, rather than placing the burden of maintenance and repair on each individual tenant in a multiple-unit dwelling, it is more expedient for the protection of others in the building to place the burden on the landlord.

A second reason for the limitation of the ruling in *Jack Spring* to multiple-unit dwellings and one closely related to the first reason stated above, is apparent from a statement first made in *Javins v. First National Realty Corp.* (D.C. Cir. 1970), 138 U.S.App. D.C. 369, 428 F.2d 1071, 1078, and quoted in *Jack Spring* at 50 Ill. 2d 351, 365, 280 N.E.2d 208, 216: "In a multiple dwelling repair may require access to equipment and areas in the control of the landlord," thus making it impractical or impossible for an individual tenant to perform repairs. Because of the exclusivity of possession involved in the rental of a single-unit dwelling, however, this same concern should not pertain.

■■ In addition to the fact that the ruling in *Jack Spring* was limited to multiple-unit dwellings it is also significant that *Jack Spring* involved the assertion of violations of the building code of Chicago. The Supreme Court in *Jack Spring* pointed out that the situation then before it was analogous to that of an earlier case (*Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 165 N.E.2d 286) in which the court had held that an applicable building code was as much a part of a real estate sales contract as those parts enumerated by the parties. The Supreme Court then went on in *Jack Spring* to point out that the implied warranty of habitability in the case before it would be "fulfilled by substantial compliance with the pertinent provisions of the Chicago building code." By way of contrast, however, in the instant case plaintiff's fifth amended complaint made no allegation of a violation of an applicable building code; nor did it even allege that a

building code was in effect in Johnston City, Illinois. It can hardly be assumed, therefore, that plaintiff's oral lease incorporated the provision of a building code just as if such provisions had been enumerated by the parties.

We also note that *Jack Spring* involved a forcible entry and detainer action brought by the landlord against certain tenants for the failure of the tenants to pay rent. The implied warranty of habitability was asserted by the tenants merely as a defense, and was found to be "germane to the decisive question of whether the defendants were indebted to plaintiffs for rent." (50 Ill. 2d 351, 366, 280 N.E.2d 208, 217.) Nowhere in *Jack Spring* do we find an indication that the Supreme Court, by applying an implied warranty of habitability in multiple-unit dwelling rentals, intended to change the established law in Illinois governing personal injury suits by tenants against landlords. Such a change would have far reaching and serious consequences. For this court to find that the Supreme Court contemplated such a serious change in the law, when it made no discussion on the subject, would be entirely inappropriate. We are, therefore, unwilling to adopt plaintiff's argument with respect to the applicability of *Jack Spring* to the instant case.

Plaintiff has not cited any cases in which a tenant has been allowed to recover for personal injuries under a theory of an implied warranty of habitability. Our own research indicates that a few such cases have occurred in jurisdictions other than Illinois. In a California case (*Charleville v. Metropolitan Trust Co.* (1934), 136 Cal. App. 349, 29 P.2d 241) and in three Massachusetts cases (*Hacker v. Nitschke* (1942), 310 Mass. 754, 39 N.E.2d 644, 139 A.L.R. 257; *Ackarey v. Carbonaro* (1946), 320 Mass. 537, 70 N.E.2d 418; and *Horton v. Marston* (1967), 352 Mass. 322, 225 N.E.2d 311) the courts have held that a tenant could properly recover under an implied warranty of habitability or suitability for occupancy when he had been injured as a result of some defect in the *furnished* apartment he had rented. In *Charleville, Hacker,* and *Horton* the defect occurred with respect to some aspect of the furnishings; in *Ackary,* the defect occurred with respect to a piazza railing.

The rulings in those four cases rest upon a doctrine first adopted in an English case (*Smith v. Marrable* (1843), 11 Meeson & Welsby 5) and later adopted in some of the States in this country. (See 51C C.J.S. *Landlord & Tenant,* §305b (1968).) The rule adopted in *Smith v. Marrable* was that in all leases of furnished houses there is an implied warranty of habitability and fitness. That rule was never adopted in this State and, in fact, was expressly rejected in *Rubens v. Hill,* 115 Ill. App. 565, *aff'd.* 213 Ill. 523, 72 N.E. 1127. We, therefore, do not feel that the rulings of *Charleville, Hacker, Horton,* or *Ackarey,* can aid plaintiff in the instant case.

As we noted earlier in this opinion, the New Hampshire Supreme Court

in *Sargent v. Ross*, held that in determining a landlord's liability in tort for injuries caused by a condition of rented residential property, the focus would be on whether the landlord had exercised ordinary care rather than on which party had control of the area where the injury occurred. This ruling followed and was based upon the court's earlier decision in *Kline v. Burns* (1971), 111 N.H. 87, 276 A.2d 248, an action by a tenant for rent paid, in which the court held that there was an implied warranty of habitability in the lease. In explanation of the step it took from its ruling in *Kline* to its ruling in *Sargent* the court stated:

> "We think that now is the time for the landlord's limited tort immunity to be relegated to the history books where it more properly belongs.
>
> This conclusion springs naturally * * * from our recent decision in *Kline v. Burns*, [citation]. *Kline* was an apartment rental claim suit in which the tenant claimed that the premises were uninhabitable. Following a small vanguard of other jurisdictions, we modernized the landlord-tenant contractual relationship by holding that there is an implied warranty of habitability in an apartment lease transaction. As a necessary predicate to our decision, we discarded from landlord-tenant law 'that obnoxious legal cliche, *caveat emptor*.' [Citation.] In so doing, we discarded the very legal foundation and justification for the landlord's immunity in tort for injuries to the tenant or third persons. * * *
>
> To the extent that *Kline v. Burns* did not do so, we today discard the rule of 'caveat lesee' and the doctrine of landlord nonliability in tort to which it gave birth. We thus bring up to date the other half of landlord-tenant law. Henceforth, landlords as other persons must exercise reasonable care not to subject others to an unreasonable risk of harm." *Sargent v. Ross*, 113 N.H. 388, 396-97, 308 A.2d 528, 533-34.

Because of the express limitations placed upon the ruling in *Jack Spring*, as discussed above, it cannot be said that *Jack Spring* like *Kline v. Burns* has completely discarded the rule of *caveat emptor*. *Caveat emptor* still remains a part of landlord-tenant law in this State, although perhaps not to the same extent that it was at one time. Moreover, we are not convinced that landlord-tenant law would be "modernized" by totally discarding the rule.

One writer has offered the following explanation of the ruling in *Sargent v. Ross*:

> "This progression in the law of landlord and tenant with respect to tort liability arising from the condition of the property parallels in some respects developments in the field of products liability, where the move was from artificial rules of privity, which

effectively shielded the manufacturer from liability, to the implication of warranties of fitness and the application of negligence rules. It is perhaps not too wild a surmise that the next step may be, under theories of enterprise liability, the adoption of a rule of strict liability under which the landlord will be automatically charged with responsibility for the injuries caused by defects in his property, as one of his normal costs of doing business." 64 A.L.R.3d 339, 343-44.

This comment leads us to ask whether a development of landlord-tenant law parallel to the development of product liability law is a progression necessarily required for landlord-tenant law to keep pace with present-day realities. For a couple of reasons, we think that it is not.

At one time in product liability law the manufacturer was, because of privity concepts, *totally* insulated from recovery by the eventual purchaser who became injured through use of the product. (See *Winterbottom v. Wright* (1842), 10 Meeson & Welsby 109, 152 Eng. Rep. 402; Prosser on Torts 622, 641 (4th ed. 1971).) In order to remove this privity straightjacket and allow the purchaser to recover from the manufacturer responsible for the defect causing the injury, the courts developed a number of grounds for recovery, starting with negligence (*MacPherson v. Buick Motor Co.* (1916), 217 N.Y. 382, 111 N.E. 1050), later adding implied warranties (*Henningsen v. Bloomfield Motors, Inc.* (1960), 32 N.J. 358, 161 A.2d 69), and finally arriving at strict liability in tort. (*Greenman v. Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R. 3d 1049; *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 210 N.E.2d 182.) See Prosser on Torts 641-658 (4th ed. 1971).

In landlord-tenant law, on the other hand, the landlord, although having the benefit of a limited immunity through the rule of *caveat emptor*, is not *totally* insulated from recovery for injuries sustained by the tenant or third persons as a result of defects in the premises. As we have already pointed out, there are several exceptions which can allow for recovery from the landlord; and these exceptions cover many injuries. Additionally, building codes in force in many localities today have the effect of protecting tenants, to a certain extent, by requiring landlords to keep their buildings within applicable standards. At the time of the early product liability law developments away from privity notions, purchasers of manufactured products did not have the benefit of anything comparable to a building code to control manufacturers. It can hardly be said, therefore, that a present-day tenant injured by a defect in the leased premises is in the same remediless position with respect to the landlord as the injured purchaser once was with respect to the product manufacturer.

In light of the foregoing discussion, we conclude that plaintiff would

not have been entitled to recover for personal injuries on the basis of a breach of an implied warranty of habitability. Therefore, we also find no error with respect to the dismissal of the second count of plaintiff's fifth amended complaint. The judgment of the trial court is affirmed.

Affirmed.

KARNS, P. J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

Perhaps one of the most well-recognized yet unexplained phenomena of the common law is *stare decisis*—the principle that courts will stand by precedent and refuse to disturb a settled point. No doubt wisdom and authority are construed as a function of time, the theory being that a principle of long-standing nature could not weather the attacks made upon it over the years unless it is a well-reasoned interpretation of the law. This concept is not without some respectable rationale, for a doctrine of considerable years has been scrutinized and ultimately sustained by noted scholars of the law. But time-honored expressions and guidelines are not always accurate or appropriate. Sometimes the blessings of time have worked to perpetuate a proposition far beyond the period of its usefulness and relevance to society and have maintained its influence after the reasons giving rise to its existence have long since been forgotten.

One such doctrine is that of *caveat emptor* in real estate leasing. This doctrine arose at common law during feudal times when leases were of an agrarian nature. The lessee obtained not only shelter but such a great deal of control over the land as to be viewed as the owner of the land for a specific period of time. Land, being to a large extent the essence of survival, was of primary importance with the structures erected upon it being only incidental. In addition, these buildings were of a simple structure, making them easy to repair by the lessee. During those times, society was largely agrarian in nature, with lessees staying on one piece of land for an extended period. Thus, with the total control existing over many years it is understandable that the developing property law treated the lessee as the owner of the premises for all practical purposes. There were no continuing covenants between the lessor and the lessee nor was there a feasible opportunity or desire for the landlord to make improvements on the structures. Therefore, there was no warranty of habitability in leases at common law. Annot., 40 A.L.R. 3d 646 (1971).

Over the years, courts have recognized the harsh results occasioned through a blind obedience to the rule of *caveat emptor* and have carved out exceptions to the doctrine. Recently, courts have recognized the impracticality of the common law rule and have rejected it in favor of the

doctrine of implied warranty of habitability. The Illinois Supreme Court, while stopping short of adopting the implied warranty of habitability in all cases, has taken a giant step in that direction in the case of *Jack Spring, Inc. v. Little*, 50 Ill. 2d 351, 280 N.E.2d 208. While the decision was limited to its own facts, the Supreme Court evidenced its predisposition through such remarks as the following:

> "We find the reasoning in *Javins* persuasive and we hold that included in the contracts, both oral and written, governing the tenancies of the defendants in the multiple unit dwelling occupied by them, is an implied warranty of habitability \* \* \*." 50 Ill. 2d 351, 366.

The Supreme Court's ruling was based upon the idea that the common law rationale of *caveat emptor* was outmoded in today's urban society. Lessees are not now interested in the land, but rather in a dwelling. Today's dwellings are much more complex in design and not easily repaired by a low-income lessee who generally lacks the financial and/or mechanical ability. Furthermore, present-day lessees are far more mobile than lessees of feudal times and consequently occupy dwellings for a much shorter period of time.

I cannot agree with the majority that the rationale of *Jack Spring* does not extend to this case. Here, the appellant leased a residential home, not a unit in a multiple-unit dwelling; but the reasoning of the Supreme Court is equally applicable. There is no logical reason for distinguishing between a home and a multiple-unit dwelling. Lessees of both are faced with nearly identical problems. Both are in search of the same product, a habitable dwelling, and both are in the same financial condition and bargaining position (or lack of it). The appellant here was economically handcuffed as an urban multiple-unit dweller. She had a limited income and could afford only low rent housing. She had attempted to find other suitable housing but was prohibited by her limited financial ability. To protect the lessee of a multiple-unit dwelling with an implied warranty of habitability while not extending the same protection to the lessee of a home reaches an illogical and unjustifiable result. Such reasoning favors lessees in major metropolitan areas where most multiple-unit dwellings are located while denying lessees in smaller communities in rural areas who lease residential homes, the same protection in their leases.

I do not find persuasive the reasons given by the majority for the inapplicability of the *Jack Spring* decision. While the exclusivity of possession may have once been a viable factor, I think that the majority attaches to it an unrealistic importance. Whether a tenant is in exclusive possession of the entire housing unit or a segment of a larger building does nothing to affect his financial ability to make needed repairs.

Nor do I agree with the significance that the majority attaches to the

existence of a building code. While it is true that the Illinois Supreme Court in *Jack Spring* tested compliance of the implied warranty of habitability by use of the Chicago Building Code, I cannot agree that the nonexistence of such a building code should necessarily preclude the application of the doctrine. It is no doubt correct, as the appellant has argued, that not every community has a building code. To adopt such a measure as the majority does in this case effectively punishes those inhabitants of communities lacking such codes.

In my opinion, the majority in this case properly states the law in Illinois as it existed prior to the decision in *Jack Spring*. However, the language of *Jack Spring* leads me to believe that our Supreme Court, when faced with the exact question that is presented here, will adopt the modern rule of implied warranty of habitability as arged by the appellant. As conceded by the majority, numerous recent decisions have adopted this position as the sensible approach in a 20th century society. (*Lemle v. Breeden* (1969), 51 Hawaii 426, 462 P.2d 470, 40 A.L.R. 3d 637; *Kline v. Burns* (1971), 111 N.H. 87, 276 A.2d 248; *Hinson v. Delis* (1972), 26 Cal. App. 3d 62, 102 Cal. Rptr. 661; *Mease v. Fox* (Iowa 1972), 200 N.W.2d 791; *Morbeth Realty Corp. v. Velez* (1973), 73 Misc. 2d 996, 343 N.Y.S. 2d 406; *Berzito v. Gambino* (1973), 63 N.J. 460, 308 A.2d 17; *Charleville v. Metropolitan Trust Co.* (1934), 136 Cal. App. 349, 29 P.2d 241; *Hacker v. Nitschke* (1942), 310 Mass. 754, 39 N.E.2d 644, 139 A.L.R. 257; *Ackarey v. Carbonaro* (1946), 320 Mass. 537, 70 N.E.2d 418; *Horton v. Marston* (1967), 352 Mass. 322, 225 N.E.2d 311. See also 40 A.L.R.3d 637 and Annot., 64 A.L.R.3d 339 (1975).) I believe the following excerpt from *Sargent v. Ross* (1973), 113 N.H. 388, 396, 308 A.2d 528, 533, 64 A.L.R.3d 329, 335, captures the sentiment of many of these recent decisions and correctly describes the direction we should follow:

> " 'Considerations of human safety within an urban community dictate that the landowner's relative immunity, which is primarily supported by values of the agrarian past, be modified in favor of negligence principles of landowner liability.' [Citations.] 'In modern times the immunities have rightly though gradually, been giving way to the overriding social view that where there is foreseeability of substantial harm landowners, as well as other members of society, should generally be subjected to a reasonable duty of care to avoid it.' [Citation.] We think that now is the time for the landlord's limited tort immunity to be relegated to the history books where it more properly belongs."

Finally, I feel that the facts of this case present such an extreme situation as to require the application of the doctrine. Here the premises were leased with concrete blocks serving as back steps. As such, an often used method of ingress and egress was rendered very dangerous. The

premises were evidently leased with the landlord being aware of this dangerous condition and likewise being aware of the tenant's financial or mechanical inability to remedy the condition. Thus, this was more than just a step that weakened with age or a handrail that loosened with use; it was tantamount to leasing a house without any steps at all. In circumstances such as those presented by this case, I believe the doctrine of implied warranty of habitability is particularly applicable.

I dissent.