LOUIS ZIMMER, *ET AL.*, PLAINTIFFS-APPELLANTS, v.
WESTINGHOUSE ELECTRIC CORPORATION, A CORPO-
RATION OF PENNSYLVANIA, DEFENDANT-RESPOND-
ENT.

Argued January 7, 1958—Decided March 17, 1958,

340

*Mr. Albert L. Kessler* argued the cause for appellants (*Messrs. Weiner, Weiner & Glennon,* attorneys).

*Mr. Walter F. Waldau* argued the cause for respondent (*Messrs. Stryker, Tams & Horner,* attorneys).

The opinion of the court was delivered by

HEHER, J. This is a class action by six hourly-paid employees of the defendant, Westinghouse Electric Corporation, in behalf of themselves and some 1,700 fellow employees of like status, for holiday pay claimed for July 4, 1954 under a collective bargaining agreement made October 1, 1950 between the defendant employer and the International Union of Electrical, Radio and Machine Workers, C. I. O., providing thus, section XI: "All hourly paid employes who have completed three (3) months' continuous service immediately preceding an observed holiday will be paid for their established shift hours on such holiday"; "[h]ourly paid employes who were laid off for lack of work and are rehired within one (1) year after layoff, who completed three (3) months' continuous service prior to their layoff, will receive the above holiday payment"; such "payment will be made only to hourly paid employes who are on the active roll as of the day before the observed holiday

within the week and who earn some wages during the week in which such holiday falls or any of the four preceding weeks," section XI, paragraph 1(f); and "[s]alary employes will be paid for the seven (7) observed holidays."

Independence Day was among the seven enumerated holidays. Monday observance was provided for holidays falling on Sunday, and on another designated day between Monday and Friday for holidays falling on Saturday. There was a special provision, not involved in this inquiry, for Washington's Birthday and also where "a state law requires the observance of a holiday not [therein] listed."

The employer pleaded in defense "work stoppage[s] and strike[s] in violation" of the stated agreement "on numerous days prior to July 4, 1954, * * * continue[d] to July 8, 1954," "strikes, slow-downs and stoppages of work during the life of the agreement * * * and in the three-month period directly prior to Independence Day, July 4, 1954"; also that the plaintiff employees and those whom they represent "did not and have not completed three months' continuous service immediately preceding" the given holiday, all cited as conditions precedent to the accrual of the contractual right to holiday pay, and that the case is ruled by *Kennedy v. Westinghouse Electric Corporation*, 16 *N. J.* 280 (1954).

A jury was empaneled to try the issue; there were a stipulation of facts and oral testimony, and in the course of the trial the complaint was amended to include a second count alleging an oral agreement made July 7, 1954 providing for the payment of holiday pay for July 4, 1954. At the close of the plaintiffs' case, the first count was dismissed for want of the continuity of service made a precondition to recovery under the bargaining agreement; at the conclusion of the defendant's proofs the second count was submitted to the jury; there was a general verdict of no cause for action; and plaintiffs' motion for a new trial was denied.

We certified, *sua sponte,* plaintiffs' pending appeal to the Appellate Division of the Superior Court.

The contention is that (a) the plaintiff employees "have fulfilled the requirements of the labor agreement"; (b) a "work stoppage does not deprive workers of holiday pay"; and (c) "continuous service has the same meaning for holiday and vacation pay clauses as for seniority rights"; hence, *Kennedy v. Westinghouse Electric Corporation, supra,* is not in point.

The essential facts were stipulated in part at the trial. By written notice given by the local union March 31, 1954, the "local supplement" to the basic "National Agreement" was terminated, and negotiations for a new local supplement were still in progress when on June 1, 3, and 16, 1954 defendant "in accordance with the established practice, requested the employees in the shipping and receiving department to work overtime." With few exceptions, the 65 workers in that department refused the request, and on June 16 ensuing defendant notified "those in shipping and receiving who had unjustifiably refused to work overtime" of "a one-day disciplinary furlough" on June 17, 1954, "[t]hat is, without pay"; and on that day "the entire [group of] hourly workers" in the plant, approximately 1,700, remained away from work "in sympathy" with the 65 furloughed. All returned to work the next day.

The same course was taken June 21 ensuing, with a like result; a three-day disciplinary furlough followed, commencing June 22, and all the plant employees remained away from work during the period of discipline; June 28, a request for overtime service was again refused; a three-day furlough was ordered, effective the next day and continuing until July 1; once again the plant employees abstained from work for the furlough period and for the same reason, and on July 1 a three-day disciplinary furlough was imposed on all the plant's hourly workers, some 1,700, "excepting now, shipping and receiving," for July 2, 6, and 7, "for their having gone out or not having returned to work in sympathy with shipping and receiving on the previous occasions."

July 2, 6, and 7, 1954, "those in shipping and receiving stayed out in sympathy with the rest of the plant, so that for those three days, for all practical purposes, nobody was working at the plant; at least none of the hourly workers were working at the plant"; but on July 8, the "last disciplinary furlough day," the "plant was back at work. Everybody was working."

It was agreed that none of the plant's hourly workers, "shipping and receiving or the rest of the plant, 1,700 employees, received any pay whatsoever for the days for which they were given a disciplinary furlough, or for the days that either of the groups stayed out in sympathy with the other"; "none of these employees [were paid] for these days that they were out of the plant, whatever the reason"; and "none of the hourly employees were paid for the holiday of July 4, 1954."

It was also stipulated that "there is nothing in [the] contract which makes it mandatory for any of the employees to work overtime"; and it had been the "past practice * * * up until June of 1954" to comply with the company's requests for overtime service and no difficulty had been encountered in fulfilling its needs in this regard.

It is said in argument that "the failure to volunteer for overtime work * * * brought the imposition of disciplinary furloughs which caused the workers in other departments to stay away from their jobs in sympathy"; and the "very essence of collective bargaining would be greatly impaired if an employer could impose disciplinary furloughs upon those workers who refused to volunteer for overtime and their fellow employees could not then act as a unit." "Justice and fair play," it is insisted, "require that if an employer shall expect a certain minimum number of hours in a work week, then the employees shall anticipate a certain maximum number," and "if the employer is permitted to punish by disciplinary furloughs for failure to work overtime, then the employees must be able to avail themselves of retaliatory measures."

"Continuous service," it is declared, "does not mean performance of labor during every day, but includes holidays, illnesses, and other reasonable excuses"; and " 'disciplinary furloughs' did not constitute a 'break' in service because they were imposed without cause and those who stayed out in sympathy acted as a collective bargaining unit"; "[e]ven those who went to dentists or doctors and therefore could not work overtime were given disciplinary furloughs."

In a word, it is urged that holiday pay "is not a bonus or gratuity" but "an assurance of regular steady income even when there are holidays during the work week"; that "[s]trikes do not constitute a termination of employment" and a "work stoppage which breaks continuity of service must be an unjustified cessation"; the employees "worked during the 8-hour shifts required by their contract."

But reasonable overtime work had had the sanction of custom and usage; and it would seem that, even though there was no continuing obligation from mere usage to render such extra service according to the employer's varying need, the employer's imposition of disciplinary furloughs for the abrupt refusal to conform to the established practice, as a pressure maneuver in the employer's view toward the acceleration of a favorable new local supplemental agreement in other areas of controversy, called for the use of the stipulated grievance process to assess the propriety of the action rather than a work stoppage by the walkout of all of the plant's employees in contravention of the current national labor agreement.

By section III of the national agreement it was affirmed that the agreement was made "in consideration of the mutual performance thereof in good faith by both parties," and its "intention" was "to establish harmonious relations between the Company and the Union and its membership and to promote the general welfare of the Company and the employes," and the parties obligated themselves "to cooperate in every reasonable way in carrying out [its] provisions and to exchange such information with respect [thereto] as is mutually deemed essential for the furtherance

of harmonious relations"; the union "recognizes that it is the responsibility of the Company and its Plant Managements to maintain plant efficiency and agrees that Management shall have the freedom of action necessary to discharge its responsibility for the successful operation of the company. * * *"

Section VI provides that subject to the terms of section XVIII, the union and the locals "will not cause or officially sanction their members to cause or take part in any strike (including sit-downs, stay-ins, slow-downs, or any other stoppage of work) during the life of this Agreement"; and "[t]his includes disputes which are within the proper scope of the grievance procedure provided in this Agreement or the applicable local supplement (a) until such grievance procedure has been fully exhausted, and (b) thereafter except as provided in Paragraph B below," providing that when the "grievance procedure has been exhausted as provided for in Section XIV, the Union headquarters may authorize a strike of the employes in a bargaining unit in support of a grievance involving such bargaining unit"; "[s]uch a strike, when so authorized, shall not be a violation of this Section if both of the following conditions are satisfied: (a) if written notice that Management's reply is unsatisfactory (Paragraph B3, Section XIV) has been given and (b) if the grievance has not been referred to an impartial umpire or board by mutual agreement of the Union and the Company."

Section XIV embodies the grievance procedure, first on the local or plant level, and, if the grievance is not there resolved, on the "national appeal level," at the instance of the local or the union or the local management or the company, according to a particularized process. And it is provided that should the dispute remain unsettled "after exhausting the grievance procedure at both local and national levels, and if the Union and the Company do not agree to refer it to an impartial umpire or board," as therein provided, "then either party shall be free, without obligation, however, upon the other party, except as provided by

law, to request the services of governmental conciliation, mediation or other appropriate government agency in an effort to settle such grievance."

June 16, 1954, the local gave notice to management of its objection to the company's action "in disciplining shipping and receiving employees on 6/16 for refusing to work overtime," as in violation of the "National Agreement Section IX Hours of Work 1," and its demand that the disciplined employees "be brought back to work immediately and be paid for all time lost." The notice was endorsed:

"Meeting held and verbal answer given 6/16 Verbal answer not accepted and grievance procedure exhausted 6/16"

There the matter ended. The appellate process was not invoked; nor was the work stoppage authorized or sanctioned by the union or the local.

Thus, the work stoppages here were all plainly in violation of the basic labor agreement; there was a voluntary interruption in the continuity of service during the three-month period made a pre-condition to holiday pay for Independence Day 1954, under section XI of the agreement —a deliberate *ex tempore* cessation of work in disregard of the workers' contractual commitments. Indeed, it seems to be conceded that none of the plaintiff employees nor those whom they represent are entitled to pay for the periods in question.

As to custom and usage, the proofs show that the employees who refused overtime service during June and early July 1954 had worked overtime in May and later in July 1954; that never before June 1954 had there been a "mass refusal" to work overtime; that overtime was generally desired by the employees, and they had sought a spreading of the work that the greater number of the employees might share in the extra wage. And the company in the particular instances made known to the employees that overtime service for a few weeks was necessary to place new models on display and thereby to meet the keen competition of others in the field. The normal quitting hour of the work shift was 3:30

P. M., and two to four hours' overtime was requested. Various reasons were given for the refusal, such as appointments with physicians and dentists, suggesting for the most part that it was not due to a common agreement to adhere to the eight-hour day as a matter of policy.

But "continuous service," it is said, has the same meaning for "holiday and vacation pay" as for "seniority rights." The argument is that plaintiffs meet the requirements of section XI, paragraph 1(f), of the national agreement "because all of them would have been working on July 2nd, the last day before the holiday, if the company had not furloughed them"; the company "cannot evade its obligation for holiday pay by furloughing for a period which includes the holiday"; the "employment status continued despite the furloughs"; the employer "should not have power to separate holiday and vacation benefits from accumulation of seniority"; the "wrongful action of the company in imposing disciplinary furloughs led to sympathetic walkouts"; the plaintiffs "complied with the requirements of the 40-hour week and 8-hour day"; they "never worked partial days as did the employes in the *Kennedy* case"; when "a disciplinary furlough was imposed on one group, all accepted a like fate"; "[u]nified action is the basis of labor's strength."

And it is suggested that the contrary view would transgress the right of persons in private employment "to organize and bargain collectively," secured by *Article 1, paragraph 19* of the 1947 *State Constitution.*

It is argued that "continuity of service" is not broken by "occasional interruptions" and "performance of labor during every scheduled hour is not contemplated," citing *United States v. Perry,* 55 *F.* 2d 819 (*C. C. A.* 8 1932), holding that "continuously" does not mean "every day or some definite fixed period as a year or a month, but rather means a substantial portion of time"; and that "[h]olidays, sickness, recreation periods, week-ends, all are breaks in the continuity of one's occupation, but would not necessarily destroy its continuity."

■ But in this setting "continuity of service" cannot be equated with "continuity of the employment status." "Service" obviously means actual service, and the requisite continuity is lacking where, as here, the break is the consequence of the employees' voluntary choice, a willful work stoppage forbidden by the imperative terms of the labor agreement.

Such is the rationale of *Kennedy*. Just as the employees' own curtailment of "shift hours" in that case was found to be a "work stoppage" in violation of the labor agreement, in its basic terms the same as the agreement under review, so also were there forbidden work stoppages here in the form of a walk-out for a day at the outset and later for successive days. It would be illusory to distinguish in this context between a daily curtailment of working hours, by concert of action as a means of pressure in pending negotiations, and a refusal of service for a day or successive days. In *Kennedy,* Justice Brennan said that the employees there "did render continuous labor" in the "sense that they put in some hours of labor on each work day of the period," yet "[i]t opposes common sense to attribute to the parties' language a meaning to excuse willful stoppages violative of the solemn undertaking not to do such things." Such an interpretation "is a complete negation of the primary purpose of the collective bargaining agreement; it fosters resort to stoppages instead of to negotiations to settle disputes"; the "only reasonable interpretation is that the unilateral adjustment of shift hours was not within the category of excusable interruptions of service in the sense contemplated by the agreement and therefore destroyed its continuity." There is an essential difference between "continuous service" and "continuous employment." *Iron Molders' Union No. 125, of Milwaukee, Wis. v. Allis-Chalmers Co.,* 166 *F.* 45, 20 *L. R. A., N. S.,* 315 (*C. C. A.* 7 1908) ; *Keith Theatre v. Vachon,* 134 *Me.* 392, 187 *A.* 692 (*Sup. Ct.* 1936).

■ We have no occasion now to consider the right of work stoppage in the abstract and in other and different circumstances; it suffices to hold that by the workers' deliberate withdrawal from service here, the contractual

*sine qua non* of continuous service for holiday pay is not met. These employees have not been paid for the periods in question, for failure of service; they are not seeking the wages thereby lost; yet they demand holiday pay that is conditioned on uninterrupted work during the immediately preceding stipulated time.

We have here a bilateral agreement expressing a common understanding on the terms and conditions of labor and declaring reciprocal rights and duties to realize the mutual aims and purposes of the parties, and it is to be enforced accordingly. *Kennedy v. Westinghouse Electric Corporation, supra; Owens v. Press Publishing Co.,* 20 *N. J.* 537 (1956).

Error is assigned on the refusal of the judge "to permit evidence as to past practices of the defendant regarding holiday pay."

This has reference to alleged disciplinary furloughs visited on other employees "who left [work] of their own volition" just before holidays in 1952, 1953, and 1954, yet were given holiday pay, as bearing on the import of "words of doubtful meaning," citing *Kennedy*. The proffered evidence is described as "tending to show that the defendant did not consider short absences as breaks in 'continuous service.'"

But there was no showing of comparable circumstances; and, at all events, the contractual provision is not ambiguous, and what the employer may have done on other occasions in different circumstances could have no relevancy to the issue raised here.

Lastly, it is urged that there was error "in permitting the defendant's witnesses to refresh their recollections from notes made by one of defendant's witnesses," Muehlig, its industrial relations representative, who prepared the minutes of a meeting between representatives of the company and the union, attended by the witnesses in question.

It is said that the notes or minutes were Muehlig's "work product alone and not those of the other [company] witnesses who could not be expected to vouch for the accuracy of

the notes which were not prepared by them or in collaboration with them."

The principle invoked is that a witness "must be certain of the accuracy of notes used by him to refresh his recollection," citing *Titus v. Gunn*, 69 *N. J. L.* 410 (*E. & A.* 1903), and *Hill v. Adams Express Co.*, 74 *N. J. L.* 338 (*Sup. Ct.* 1907).

But that rule has not been violated here. The witnesses testified from present actual recollection revived; the notes or minutes were used as a stimulus to present memory, and there is no sound reason in principle why the use of the writing to this end should be forbidden merely because it was the manual preparation of another. The witness' authorship is not essential if the paper actually refreshes memory. The purpose is the legitimate use of written aids to the revival of recollection; and the test is whether the witness puts before the court what purports to be but is not in fact his recollection and knowledge. 3 *Wigmore on Evidence* (*3d ed.*), §§ 758, 759; *McCormick on Evidence*, § 9. Said Lord Ellenborough, L. C. J.:

"If upon looking at *any* document he can so far refresh his memory as to recollect a circumstance, it is sufficient; and it makes no difference that the memorandum is not written by himself, for it is not the memorandum that is the evidence but the recollection of the witness." *Henry v. Lee*, 2 *Chitty* 124 (1810).

And see *Kellam v. Akers Motor Lines, Inc.*, 133 *N. J. L.* 1 (*E. & A.* 1945); *State v. Mucci*, 25 *N. J.* 423 (1957); *Myers v. Weger*, 62 *N. J. L.* 432 (*E. & A.* 1898); *Marti v. Standard Fire Insurance Co.*, 127 *N. J. L.* 591 (*E. & A.* 1942); *United States v. Riccardi*, 174 *F. 2d* 883 (*C. C. A.* 3 1949), *certiorari* denied 337 *U. S.* 941, 69 *S. Ct.* 1519, 93 *L. Ed.* 1746 (1949).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For reversal*—None.