Leonard H. Sandler, J.
At issue here is the disposition of a sum of money representing monthly rents deposited with the Clerk of this court by the tenant pursuant to an order entered under section 755 of the Real Property Actions and Proceedings Law.
The landlord asserts his right to the money, contending that it had corrected the conditions which gave rise to the order, and that in any event the tenant’s subsequent departure from the apartment automatically entitled it to the deposited rents.
The tenant claims in response that from the date of the 755 order until the termination of the tenancy, conditions persisted which justified the continuance of the order, and that she in turn should receive the deposited money, first, because that result more effectively advances the purposes of section 755, and second, because of the landlord’s alleged breach of the implied warranty of habitability.
At a time when the courts in this State and elsewhere are engaged in a serious effort to adapt rules of law governing relations between landlords and residential tenants to existing social realities, the case presents important and interesting questions.
*998 In 1970, the landlord began a nonpayment summary proceeding, which resulted in the entry by a Judge of this court of a section 755 order, pursuant to which the disputed rents were deposited. Some time thereafter, the landlord moved to vacate the order and recover the moneys deposited, alleging that the conditions giving rise to the order had been corrected. A ruling in favor of the landlord on that motion was reversed by the Appellate Term, and remanded to this court for a redetermination de novo, with an opinion that found that the record established grounds for continuation of the section 755 order.
Significantly, the reversal occurred after the Appellate Term had been informed that the tenant had departed from the premises while the appeal was pending. Although the Appellate Term then vacated the section 755 order, it refused to abate the appeal as moot, and its subsequent decision establishes at the very least that the tenant’s departure from the apartment did not automatically entitle the landlord to the deposited money.
Turning to the evidence adduced at the trial before me, it is not disputed that the landlord in the period following the section 755 order did undertake to correct certain of the existing conditions. It seems equally clear that these efforts fell far short of that which was required, and that at all times from the entry of the order until the termination of the tenancy, the condition of the apartment was ‘ ‘ such as to constructively evict the tenant ’ ’ and 11 likely to become dangerous to life, health opr safety.” (Beal Property Actions and Proceedings Law, § 755.)
Specifically, there persisted a severe roach and insect infestation, with an almost total lack of extermination service; virtually nonexistent janitorial services; a nailed up back door, which prevented egress; a front door that could not be locked with a knob that continuously fell off; a recurrent backing up of malodorous waters in the kitchen sink when other tenants in the same line used plumbing facilities; severe leaks from the ceiling in the kitchen and foyer; and a variety of other defects and violations that need not be detailed.
In addition, during the winter of 1971-1972, while the appeal was pending, the tenant was provided with heat and hot water on an average of only two days a week.
Not surprisingly, the records, of the Department of Housing and Buildings confirm the existence of numerous violations throughout the period.
The conclusion is inescapable that the departure of the tenant and her family from the apartment in January, 1972 was caused by the persistence of the above-described conditions, the *999 failure of the landlord to discharge its duties, and the inability of the code enforcement agencies and this court to bring about a decent living situation in the apartment.
Any analysis at this time of the issues presented must start with the observation that in the last several years, the doctrine of implied warranty of habitability has received increasing acceptance in the courts of this State and throughout the country as the most appropriate way to restore a fair and balanced relationship between landlords and residential tenants and to encourage the decent maintenance of our residential housing supply. (Javins v. First Nat. Realty Corp. 428 F. 2d 1071 [D. C. Cir., 1970], cert. den. 400 U. S. 925 [1970]; Lemle v. Breedan, 51 Hawaii 426 [Hawaii, 1969]; Marini v. Ireland, 56 N. J. 130 [1970] ; Pines v. Perssion, 14 Wis. 2d 590 [1961]; Boston Housing Auth. v. Hemingway, 41 U. S. Law Week 2518 [Mass., 1973]; Amanuensis, Ltd. v. Brown, 65 Misc 2d 15 [Civ. Ct., N. Y. County, 1971]; Jackson v. Rivera, 65 Misc 2d 468 [Civ. Ct., N. Y. County, 1971]; Coda Control Co. v. Jimenez [L&T 11278/71, Civ. Ct., N. Y. County, May 10, 1971]; Morbeth v. Rosenshine, 67 Misc 2d 325 [Civ. Ct., N. Y. County, 1971]; Mannie Joseph, Inc. v. Stewart, 71 Misc 2d 160 [Civ. Ct,, N. Y. County].) (See, als-o, Modern Status of Buies as to Existence of Implied Warranty of Habitability or Fitness for use of Leased Premises, 40 ALR 3d 646 [1971]; Quinn & Phillips, the Law of Landlord-Tenant: Critical Evaluations of the Past with Guidelines for the Future, 38 Fordham L. Bev. 225 [1969].)
The doctrine rests upon the indisputable social reality that the apartment dweller, in exchange for the rent he pays expects not merely to occupy a certain amount of space, but also a body of goods and services which together make up a habitable apartment. (See 57 E. 54 Realty Corp. v. Gay Nineties Realty Corp., 71 Misc 2d 353 [1972].) Accordingly, it implies in every residential tenancy a warranty by the landlord to maintain the apartment in a condition suitable for decent living. Where there has been a substantial failure by the landlord to maintain the apartment in a habitable condition, the right to receive rent is made subject to a defense comparable to that available in virtually every part of our society to one who does not receive that for which he agreed to pay.
What constitutes a habitable apartment is of course a concept likely to receive intensive further exploration and development. At a minimum it would seem to require substantial compliance with that body of law which exists in every State, and which is represented in New York by the Multiple Dwelling Law, *1000 the Building Code, etc., by which the duties and responsibilities of landlords have been explicitly spelled out in terms that surely represent public policy.
As I have had occasion to note earlier (see Amanuensis, Ltd. v. Brown, 65 Misc 2d 15, supra) I am firmly persuaded that the doctrine of implied warranty of habitability is a sound, fair and necessary development in the law regulating relationships between landlords and tenants.
It has been convincingly demonstrated that the traditional rule permitting the unqualified recovery of rent by landlords who ignore their obligation to provide a decent apartment has its origin in the feudal era when possession of land was the prime concern of the tenant. (See Quinn & Phillips, supra, p. 227 et seq.; Javins v. First Nat. Realty Corp., 428 F. 2d 1071, 1074, supra.) The survival of this approach in an era marked by a dramatically different social reality has resulted in a fundamentally one-sided and unfair relationship.
By significantly reducing the economic motivation of landlords to maintain services, it had precisely the kind of effect on the maintenance of apartment units that would be recognized as inevitable if suppliers of goods and services understood that they must receive full payment even if they did not perform according to their agreement. The disastrous social and human consequences of the traditional rules have been eloquently documented. (See, e.g., Quinn & Phillips, supra, pp. 225-227; Javins v. First Nat. Realty Corp., supra, pp. 1075-1077.)
Nor is it a meaningful answer to say that tenants have the right to negotiate for better terms in their leases. The blunt fact is that most people cannot rent apartments in our urban society without signing form leases that are simply grotesque in their one-sidedness.
The doctrine of implied warranty of habitability has not been squarely passed upon by the appellate courts of this State, although it has won increasing approval among Trial Judges faced with the day by day need to achieve decent and fair results. However, a firm basis for expecting its ultimate acceptance in this State may be found in the unmistakable trend of judicial opinion throughout the country, the broad approval it has received from informed scholarly opinion, and the obvious compelling need to adapt the law to current realities. Significantly, the underlying principles of the doctrine have been fully accepted in the proposed Uniform Residential Landlord and Tenant Law, which represents the careful and painstaking work of distinguished scholars and specialists throughout the country.
*1001 That the apartment in question was not maintained in a habitable condition is clear. Absent special circumstances justifying an abatement of all rent, the normal relief available to the tenant would be to reduce the rent by the extent to which the value of the apartment was reduced by the landlord’s default in his obligation. (Cf. Basch, Landlord and Tenant [2d ed.], § 589.)
Before discussing that issue, it is necessary to consider the separate though related issue presented by the circumstance that the money at issue was deposited pursuant to a section 755 order.
Preliminarily, it is, of course, clear that a landlord who fails to correct the conditions giving rise to such an order is not automatically entitled to recover the deposited money when the tenant leaves the apartment. This was made quite clear by the action of the Appellate Term in remanding the matter to this court after learning of the tenant’s departure.
The purpose of a section 755 order, to motivate the landlord to discharge his responsibilities, would be brutally undercut, if he could calmly await the removal of the tenant because of intolerable conditions and then pick up the money. (Ellabee Realty Corp. v. Beach, 72 Misc 2d 658 [Civ. Ct., N. Y. County, 1972].) The question presented is not whether the landlord should recover all the money, but whether he should recover any of the money.
I recognize the force of the argument that would deny any recovery to a landlord who allows the persistence of conditions which the 755 order was intended to remove. Where the landlord wholly ignores the order, that would clearly be the appropriate judicial action. However, what occurred here was an effort by the landlord to respond constructively that was grossly inadequate but by no means trivial. I am persuaded that a fair result here would be to apply the rule suggested earlier in connection with the warranty of habitability, that is, to apportion the deposited rents in accordance with the value of the apartment, as reduced by the conditions found to have existed.
The fact must be squarely faced that expert testimony is not likely to be readily available in this area, assuming indeed that the issue lends itself to any meaningful kind of expert evaluation.
The plain duty of the court in confronting the problem presented is to adhere to the central principle that where damage has in fact been wrongfully inflicted, all recovery should not be denied because it is difficult to be precise. (5 Corbin, Contracts, § 1020.)
*1002 Considering the severity and pervasiveness of the deprivation of services disclosed by the evidence, I have concluded that the value of the apartment was reduced by at least one half.
Accordingly, I direct that judgment be entered awarding one half of the deposited funds to the landlord and one half to the tenant.