FLORENCE TRENTACOST, PLAINTIFF-RESPONDENT, v. DR. NATHAN T. BRUSSEL, DEFENDANT-APPELLANT.

Argued September 25, 1979—Decided March 12, 1980.

*Herbert C. Klein* argued the cause for appellant (*Klein, Chester, Greenburg & Henkoff*, attorneys; *Isaac Henkoff* on the brief).

*Gregory J. Aprile* argued the cause for respondent (*Philip M. Saginario,* attorney).

The opinion of the Court was delivered by

PASHMAN, J.

Once again this Court is asked to examine the contours of the relationship between residential landlords and their tenants.[1] Specifically, the question is whether a landlord who provides inadequate security for common areas of rental premises may be liable for failing to prevent a criminal assault upon a tenant. The trial court entered judgment for the tenant upon a jury's award of damages. The Appellate Division affirmed. 164 *N.J. Super.* 9 (App.Div.1978). We granted defendant's petition for

---

[1] See *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368 (1975); *Berzito v. Gambino*, 63 *N.J.* 460 (1973); *Marini v. Ireland*, 56 *N.J.* 130 (1970); *Coleman v. Steinberg*, 54 *N.J.* 58 (1969); *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578 (1962); see also *Dwyer v. Skyline Apartments, Inc.*, 63 *N.J.* 577 (1973); aff'g o. b. 123 *N.J.Super.* 48 (App.Div.1973); *Mayer v. Housing Auth. of Jersey City*, 44 *N.J.* 567 (1965), aff'g o. b. 84 *N.J.Super.* 411 (App.Div.1964).

certification, 81 *N.J.* 48 (1979), to consider whether the landlord was obligated to secure the entrance to the common areas of plaintiff's building. We now affirm.

## I

### *Facts*

On the afternoon of December 21, 1973, plaintiff Florence Trentacost, returned to her apartment at 273 Monroe Street, Passaic, New Jersey, from an afternoon of shopping. After she had entered her building and reached the top of a flight of stairs leading to her apartment, someone grabbed her ankles from behind and dragged her down the stairs. Her attacker, who remains unknown, left her bleeding in the ground floor hallway but returned almost immediately to steal her purse. Conscious yet unable to speak, she lay helpless for several minutes until a tenant leaving the building noticed her. Another neighbor then called the police, who took plaintiff to a nearby hospital.

Mrs. Trentacost was hospitalized for 15 days. Her injuries included a dislocated right shoulder, fractures of the left shoulder, left ankle and jaw, lacerations about the mouth and broken teeth. She wore casts on her arms and leg for about a month and a half, and at the time of trial in late 1976 still suffered from pain and loss of mobility.

At the time of the attack, plaintiff was 61 years old and a widow. She had rented her four-room apartment for more than ten years from defendant, Dr. Nathan T. Brussel. The building consisted of eight dwelling units located over street level stores with access provided by front and rear entrances. A padlock secured the back entrance, but there was no lock on the front door, which both plaintiff and apparently her assailant had used to enter the premises.

There was considerable evidence at trial regarding criminal and other suspicious activity in the vicinity of plaintiff's residence. A Passaic city detective testified that in the three years preceding the incident, the police had investigated from 75 to

100 crimes in the neighborhood, mostly burglaries and street muggings. Another policeman stated that "civil disturbances" had occurred in the area between 1969 and 1971. Two months before she was attacked, Mrs. Trentacost had herself reported to defendant an attempt to break into the building's cellar. At other times she had notified the landlord of the presence of unauthorized persons in the hallways. Plaintiff claimed the defendant had promised to install a lock on the front door, but he denied ever discussing the subject prior to the assault on plaintiff.

At the close of evidence, the trial court granted plaintiff's motion to strike the defense of contributory negligence. The judge instructed the jury in part as follows:

> A landlord owes to his tenants the duty of exercising reasonable care to guard against foreseeable dangers arising from the use of premises in connection with those portions which remain within the landlord's control. * * * The relationship between a landlord and his tenant does not impose upon the landlord the duty to protect a tenant from the crime of third persons. Only upon proper proof that the landlord unreasonably enhanced the risk of the criminal activity by failing to take reasonable measures to safeguard the tenants from foreseeable criminal conduct and a showing of suitable notice of existing defects to the landlord can a tenant recover damages from his landlord.

After the jury returned a verdict for plaintiff of $3,000, the trial court denied defendant's motion for judgment notwithstanding the verdict. *R.* 4:40–2. When defendant refused to consent to an *additur* of $15,000, the court granted plaintiff's motion for a new trial as to damages. A second jury found damages in the sum of $25,000. Defendant then appealed.

In discussing the extent of the landlord's obligation to provide security measures for his tenants, the Appellate Division found our decision in *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368 (1975), to be controlling. 164 *N.J.Super.* at 14. According to the court, "[t]he keynote of the decision in *Braitman* was simply that the liability of the landlord was properly posited upon

familiar negligence concepts." *Id.* Examining the evidence, the court concluded there was sufficient support for finding that the absence of a lock on the entrance to the building, which was located in a high-crime neighborhood, created a foreseeable risk of harm to tenants. It was therefore a jury question whether the landlord had failed to take reasonable security measures to protect the tenants. *Id.* at 16. Rejecting defendant's other arguments regarding the sufficiency and admissibility of evidence, the Appellate Division affirmed.[2]

## II

### *Liability for Foreseeable Criminal Conduct*

As the Appellate Division correctly recognized, *Braitman* supplies the focal point of controversy regarding the landlord's duty. In that case the tenants had suffered property loss resulting from theft because of a defective "dead bolt" lock on the apartment door. See 68 *N.J.* at 371–372. The trial court found that the remaining slip lock had not provided adequate security and that the landlord had received sufficient notice of the defective dead lock. *Id.* at 373. Since the robbery was within the scope of the foreseeable risks created by the inadequate security, the court found the landlord liable for negligence.

After the Appellate Division affirmed judgment for the tenants, 132 *N.J.Super.* 51 (App.Div.1974), this Court examined in detail the various evolving theories concerning the responsibilities of a landlord. We began by noting the traditional rule: "[T]he relationship between a landlord and his tenant does not, without more, impose upon the landlord a duty to protect the tenant from the crime of third persons." 68 *N.J.* at 374 (cita-

---

[2]In view of our limited grant of certification, we express no opinion as to these other arguments raised by defendant in the Appellate Division.

tions omitted). We went on, however, to cite with approval *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 141 *U.S. App.D.C.* 370, 439 *F.*2d 477 (D.C.Cir.1970), as the leading case in the trend away from that tradition.

In fashioning a duty to provide tenant security, the court in *Kline* drew upon three sources. The first, described as "the logic of the situation itself," *id.* at 376, 439 *F.*2d at 483, was the recognition that the landlord was in a better economic position than the tenant to take precautionary measures. The court adopted this as a predicate for the landlord's tort liability. *Id.* at 377, 439 *F.*2d at 484. Relying on existing law in the District of Columbia, the court noted as a second source an implied contractual undertaking to maintain those protective measures in effect at the beginning of the lease term. *Id.* at 378, 439 *F.*2d at 485. A third source was the law governing an innkeeper's duties towards his guests. The court thought this doctrine provided a more appropriate analogy than that of a medieval agrarian lease—the formal predecessor of the modern urban residential lease—for determining the landlord's obligations. See *id.* at 375, 378, 439 *F.*2d at 482, 485; see also *Javins v. First Nat'l Realty Corp.*, 138 *U.S.App.D.C.* 369, 375–377, 428 *F.*2d 1071, 1077–1079 (D.C.Cir.1970), *cert.* den., 400 *U.S.* 925, 91 *S.Ct.* 186, 27 *L.Ed.*2d 185 (1970). These three bases provided a foundation for enlarging the landlord's duty to maintain common areas of rental premises so as to safeguard tenants from foreseeable criminal conduct of third parties. *Kline*, 141 *U.S. App.D.C.* at 380, 439 *F.*2d at 487.

Although a majority of the Court in *Braitman* did not embrace the reasoning of *Kline*, see *Braitman*, 68 *N.J.* at 387–388 (separate views of Hughes, C. J., Sullivan and Pashman, JJ.), we did acknowledge "a developing judicial reluctance to allow landlords to insulate themselves from liability to their tenants for

the criminal conduct of third parties," *id.* at 378.[3] We then turned to the development of negligence liability for foreseeable criminal conduct in New Jersey. We held that "upon a logical extension of the principles of our own case law," a landlord could be held liable for creating an "unreasonably enhanced" risk of loss resulting from foreseeable criminal conduct. *Id.* at 382–383. See *Zinck v. Whelan*, 120 *N.J.Super.* 432, 445 (App. Div.1972). As in *Braitman*, here the landlord was confronted with the existence of a high level of crime in the neighborhood, see *ante* at 218–219. Yet he failed to install a lock on the front door leading in to the building's lobby. By failing to do anything to arrest or even reduce the risk of criminal harm to his tenants, the landlord effectively and unreasonably enhanced that risk. See *Braitman*, 68 *N.J.* at 381–382.

 We reiterate that our holding in *Braitman* lies well within traditional principles of negligence law. "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols*, 31 *N.J.* 188, 201 (1959). If the reasonably prudent person would foresee danger resulting from another's voluntary, criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability. See *Hill v. Yaskin*, 75 *N.J.* 139, 143–145 (1977); *Goldberg v. Newark Housing Auth.*, 38 *N.J.* 578, 588 (1962); *Brower v. New York C. & H.R.R.R. Co.*, 91 *N.J.L.* 190, 193 (E & A 1918); *Mack Trucks, Inc. v. Reading Co., Inc.*, 148 *N.J.Super.* 387, 395–398 (App.Div.1977); *Zinck v. Whelan*, 120 *N.J.Super.* at 445; *Genovay v. Fox*, 50 *N.J.Super.* 538, 550–551 (App.Div.1958), rev'd on other grounds, 29 *N.J.* 436

[3]We also noted cases decided after *Kline* which were part of this trend. *E. g., Warner v. Arnold*, 133 *Ga.App.* 174, 210 *S.E.2d* 350 (Ct.App.1974); *Johnston v. Harris*, 387 *Mich.* 569, 198 *N.W.2d* 409 (Sup.Ct.1972); *Sherman v. Concourse Realty Corp.*, 47 *A.D.2d* 134, 365 *N.Y.S.2d* 239 (App.Div.1975); see *Braitman*, 68 *N.J.* at 376–378.

(1959). *Cf. Harpell v. Public Service Coordinated Transport*, 20 *N.J.* 309, 316–317 (1956); *Menth v. Breeze Corporation, Inc.*, 4 *N.J.* 428, 441–442 (1950). Foreseeability of harm, not the fact of another's intervention, is the crucial factor in determining "whether a *duty* exists to take measures to guard against [criminal activity]." *Goldberg*, 38 *N.J.* at 583.

Application of these principles in *Braitman* led to the imposition of liability for a landlord's failure to provide adequate security against foreseeable criminal conduct. See *Braitman*, 68 *N.J.* at 378–381; see also *Kline*, 141 *U.S.App.D.C.* at 374–376, 439 *F.*2d at 481–483; *Johnston v. Harris*, 387 *Mich.* 569, 574–575, 198 *N.W.*2d 409, 410–411 (Sup.Ct.1972). They also support affirmance of plaintiff's judgment in the present case. There was ample evidence that criminal activity affecting the Monroe Street building was reasonably foreseeable. More than one witness testified to the high incidence of crime in the neighborhood. Plaintiff's own, unchallenged testimony related an attempted theft within the building. Against this background, the jury could readily view the absence of a lock on the front entrance—an area outside an individual tenant's control—as exemplifying a callous disregard for the residents' safety in violation of ordinary standards of care. Since there was sufficient evidence for concluding that the mugging was a foreseeable result of the landlord's negligence, the jury's finding of liability was warranted.

### III

#### Theories of Landlord Liability

Although we need go no further to affirm the judgment for the tenant, we choose not to ignore the alternative theories of landlord liability discussed in *Braitman*. A majority of that Court found that a violation of an administrative regulation governing the condition of multiple dwellings was independent evidence of negligence, 68 *N.J.* at 385–386, while two members

considered that breach to establish negligence conclusively, *id.* at 389 (Clifford and Schreiber, JJ., concurring). Three members raised the possibility of imposing liability for unsafe premises based on the landlord's implied warranty of habitability. *Id.* at 387–388 (separate views of Hughes, C. J., Sullivan and Pashman, JJ.). There was also mention of liability based on a covenant implied in fact to furnish adequate security. *Id.* at 389 (Clifford and Schreiber, JJ., concurring).

Over four years have passed since we decided *Braitman.* During this period the need for judicial guidance regarding landlord liability has grown. See generally Note, "The 1975–1976 New Jersey Supreme Court Term," 30 *Rut.L.Rev.* 492, 696–702 (1977). Although we need not reconcile the alternative theories of *Braitman* to resolve this case, we nevertheless take this opportunity to clarify the scope of a residential landlord's duty to his tenant. This approach is in keeping with the traditional practice of common-law adjudication followed by this Court. We recall the statement of Chief Justice Weintraub:

> [T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may express doubts upon existing doctrines, thereby inviting litigation, or may itself raise an issue it thinks should be resolved in the public interest, or may deliberately decide issues which need not be decided when it believes that course is warranted. [*Busik v. Levine,* 63 *N.J.* 351, 363–364 (1973), app. dism., 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973)]

In the spirit of this judicial philosophy, we conclude that it is necessary to reconsider "the general principle that the mere relationship of landlord and tenant imposes no duty on the landlord to safeguard the tenant from crime." *Braitman,* 68 *N.J.* at 387.

## A

### Implied Warranty of Habitability

This Court has long recognized that traditional principles of property law, when applied in the context of a residential lease, have "lagged behind changes in dwelling habits and economic realities." *Michaels v. Brookchester, Inc.*, 26 *N.J.* 379, 382 (1958). Leases acquired the character of conveyances of real property when their primary function was to govern the relationship between landowners and farmers.[4] Unlike the original, medieval tenant, the modern apartment dweller rents not for profit but for shelter.

When engaged in the business of providing shelter, present-day landlords do not furnish merely four walls, a floor and a ceiling. They have come to supply, and tenants now expect, the physical requisites of a home. An apartment today consists of a variety of goods and services. At a minimum, the necessities of a habitable residence include sufficient heat and ventilation, adequate light, plumbing and sanitation and proper security and maintenance. See *Braitman*, 68 *N.J.* at 387; *Marini v. Ireland*, 56 *N.J.* 130, 144 (1970); see also *Javins*, 138 *U.S.App.D.C.* at 372, 428 *F.*2d at 1074; *Green v. Superior Ct.*, 10 *Cal.*3d 616, 624–625, 517 *P.*2d 1168, 1173, 111 *Cal.Rptr.* 704, 709 (Sup.Ct.1974); *King v. Moorehead*, 495 *S.W.*2d 65, 70 (Mo.Ct.App.1973). Thus, "[t]he subject matter and circumstances of the letting" indicate that the "very object" of a landlord's undertaking to provide residential premises is "to furnish the [tenant] with quarters suitable for living purposes." *Marini*, 56 *N.J.* at 143.

Complete satisfaction of this undertaking receives little assistance from the forces of the marketplace. There is no doubt that New Jersey has been faced with a chronic, desperate need for

---

[4]See, *e. g.*, McGovern, "The Historical Conception of a Lease for Years," 23 *U.C.L.A.Rev.* 501 (1976).

rental housing. See *Inganamort v. Bor. of Fort Lee*, 62 *N.J.* 521, 527 (1973); see also *South Burlington Cty. NAACP v. Tp. of Mt. Laurel*, 67 *N.J.* 151, 158 (1975), app. dism., 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.*2d 28 (1975). Increasing urbanization, population growth and inflated construction costs have contributed to this shortage, thereby creating an "inequality of bargaining power between landlord and tenant." *Reste Realty Corp. v. Cooper*, 53 *N.J.* 444, 452 (1969); see *Javins*, 138 *U.S.App.D.C.*, at 377, 428 *F.*2d at 1079. As a result, the prevailing understanding regarding the nature of a residential lease has not found expression in explicit contractual terms. Because lease agreements are frequently form contracts of adhesion, they cannot be relied upon to represent a genuine "meeting of the minds" with respect to the landlord's responsibilities. The tenant therefore cannot realize his legitimate present-day demands for fair treatment in the economic forum. See *Reste Realty*, 53 *N.J.* at 454.

It is undisputed that maintaining minimum conditions of habitability, including security, is beyond an individual tenant's control. Where the task involves the common areas of a multiple-dwelling building, tenants' efforts are entirely precluded. See *Michaels*, 26 *N.J.* at 382; *Dubonowski v. Howard Savings Institution*, 124 *N.J.L.* 368 (E & A 1940). Nor in this highly mobile society should tenants be required to invest substantial sums in improvements that might outlast their tenancy. The landlord, however, can spread the cost of maintenance over an extended period of time among all residents enjoying its benefits.

Recognizing the landlord's "greater opportunity, incentive and capacity * * * to inspect and maintain," *Green v. Superior Ct.*, 10 *Cal.*3d at 627, 517 *P.*2d at 1175, 111 *Cal.Rptr.* at 711, as well as the tenant's lack of bargaining power, this Court has endeavored to give effect to the legitimate expectations which characterize the modern residential tenancy. Since our decision in *Marini v. Ireland*, we have imposed upon the landlord an implied warranty of habitability which arises from his eco-

nomic and social relationship with his tenants.[5] The scope of this warranty extends to all "facilities vital to the use of the premises for residential purposes." *Marini*, 56 *N.J.* at 144. A breach of the warranty gives the tenant the right to deduct the reasonable cost of repairs to a vital facility from his monthly rent, *id.* at 146, and a right of action for the return or reduction of rent. *Berzito*, 63 *N.J.* at 469; see also *N.J.S.A.* 2A:42–85 *et seq.* (permitting an action for court deposit of rents where dwelling units fail to meet "minimum standards of safety and sanitation").

Among the "facilities vital to the use of the premises" are the provisions for the tenant's security. Unfortunately, crime against person and property is an inescapable fact of modern life. Its presence threatens the suburban enclave as well as the inner city. Tenants universally expect some effective means of excluding intruders from multiple dwellings; without a minimum of security, their well-being is as precarious as if they had no heat or sanitation. Recognizing that a safer and more secure apartment is truly more livable, landlords frequently offer superior protective measures as an inducement for entering into premium lease agreements. Under modern living conditions, an apartment is clearly not habitable unless it provides a reasonable measure of security from the risk of criminal intrusion.

In *Braitman* we considered but declined to resolve whether the implied warranty is "flexible enough to encompass appro-

---

[5]In varying formulations, this implied warranty is now the majority rule in the United States. See, *e. g., Javins, supra* ; *Green, supra* ; *Lemle v. Breeden,* 51 *Hawaii* 426, 462 *P.2d* 470 (Sup.Ct.1969); *Jack Spring, Inc. v. Little,* 50 *Ill.*2d 351, 280 *N.E.*2d 208 (Sup.Ct.1972); *Mease v. Fox,* 200 *N.W.*2d 791 (Iowa Sup.Ct.1972); *Boston Housing Auth. v. Hemmingway,* 363 *Mass.* 184, 293 *N.E.*2d 831 (Sup.Jud.Ct.1973); *King v. Moorhead, supra* ; *Kline v. Burnes,* 111 *N.H.* 87, 276 *A.*2d 248 (Sup.Ct.1971); *Morbeth Realty Corp. v. Velez,* 73 *Misc.*2d 996, 343 *N.Y.S.*2d 406 (N.Y.C.Civ.Ct.1973); *Foisy v. Wyman,* 83 *Wash.*2d 22, 515 *P.*2d 160 (Sup.Ct.1973); *Pugh v. Holmes,* 486 *Pa.* 272, 405 *A.*2d 897 (Sup.Ct.1979).

priate security devices." 68 *N.J.* at 388 (separate opinion of Hughes, C. J., Sullivan and Pashman, JJ.). We now conclude that it is and therefore hold that the landlord's implied warranty of habitability obliges him to furnish reasonable safeguards to protect tenants from foreseeable criminal activity on the premises.

The "premises" which the landlord must secure necessarily encompass the common areas of multiple dwellings. There is no doubt that the rent charged by a landlord includes a portion for maintaining such areas. That these areas are used by all the tenants does not require a different result. Viewing "premises" as restricted to the individual dwelling units would render common areas a "no man's land" for the purposes of assessing habitability. We consider the provision of some measure of security in these areas to be "vital to the use of the premises."

Examining the facts of this case, we find that defendant breached his implied warranty by failing to secure in any way the front entrance of the building. The absence of even a simple slip lock—the most elementary of safeguards—permitted the halls and stairwells to become virtually public ways, completely accessible to the criminal element. Defendant did nothing to protect against the threat of crime which seriously impaired the quality of residential life in his building. Since the landlord's implied undertaking to provide adequate security exists independently of his knowledge of any risks, there is no need to prove notice of such a defective and unsafe condition to establish the landlord's contractual duty. It is enough that defendant did not take measures which were in fact reasonable for maintaining a habitable residence.

By failing to provide adequate security, the landlord has impaired the habitability of the tenant's apartment. He has therefore breached his implied warranty of habitability and is liable to the tenant for the injuries attributable to that breach.

## B

### Violations of Administrative Regulations

By applying the doctrine of an implied warranty to the activities of landlords, the judiciary in New Jersey joins other branches of government in recognizing that the legitimate interests and expectations of residential tenants are not fully articulated by the terms of a lease agreement. Perceiving "a critical shortage of [rental] housing * * * and that tenants, trapped by the fact, are being exploited," *Inganamort v. Bor. of Fort Lee*, 62 *N.J.* at 527, many local governments have adopted rent control ordinances to prevent unregulated economic forces from depriving their citizens of decent shelter. The Legislature's concern with the habitability of rental dwellings extends over three-quarters of a century, beginning in 1904 with the enactment of the Tenement House Act, *L.*1904, *c.* 61, *Comp.Stat.* 5321–5355 (1910). Through all its successive amendments, see, *e. g., R.S.* 55:1–1 *et seq.* (1937), it has come to constitute "comprehensive legislation intended to assure safe habitation, and it places responsibility where the Legislature has concluded it belongs"—with the landlord. *Michaels*, 26 *N.J.* at 386; see *Braitman*, 68 *N.J.* at 383 & n.10.

In *Michaels*, this Court considered the effect of the Tenement House Act upon the landlord's tort liability. We held that the duty to repair imposed by the statute did not merely cover common areas of an apartment building, or "such parts as may be in the landlord's control, actual, attenuated or fictional. * * Rather the duty to maintain in good repair embrace[d] 'all parts' which the landlord in fact provide[d]." 26 *N.J.* at 386–387. The Court interpreted the broad injunction of the statute as establishing a standard of conduct for landlords and a cause of action in negligence for its violation. *Id.* at 386.

The Tenement House Act was superceded by the Hotel and Multiple Dwelling Health and Safety Law of 1967, *L.*1967, *c.* 76,

now known as the Hotel and Multiple Dwelling Law, *N.J.S.A.* 55:13A–1 *et seq.* The new act provides stronger and more detailed measures than the former statute for the protection of tenants. See *Braitman*, 68 *N.J.* at 383; *N.J.S.A.* 55:13A–2. Most significant is the Legislature's delegation of power to the State Commissioner of Community Affairs to promulgate comprehensive and detailed regulations concerning the condition of a multiple dwelling. *N.J.S.A.* 55:13A–7. This delegation entrusts the commissioner with the responsibility of assuring "decent, standard and safe" rental housing throughout the state. *N.J.S.A.* 55:13A–2. The law requires that the regulations cover 22 separate, enumerated components of a building. See *N.J. S.A.* 55:13A–7(a)–(v). These "standards and specifications" represent the commissioner's expert judgment that the given safeguards are "reasonably necessary to the health, safety and welfare of the occupants or intended occupants of any * * * multiple dwelling." *N.J.S.A.* 55:13A–7. The regulations therefore define with the force of law, see *N.J.S.A.* 55:13A–7, –9(a), the minimum standards for safety and habitability in "multiple dwellings." *N.J.S.A.* 55:13A–3(k) (defining "multiple dwellings"). See *N.J.S.A.* 55:13A–9(b).

In *Braitman* we noted that "the violation of a statutory duty of care is not conclusive on the issue of negligence * * but it is a circumstance which the trier of fact should consider in assessing liability." 68 *N.J.* at 385. It is entirely appropriate in an action to establish civil liability to consider the landlord's statutory and administrative responsibilities to his tenants to furnish habitable residential premises. As we stated in *Michaels*, 26 *N.J.* at 386, and reiterated in *Braitman*, 68 *N.J.* at 383–386, the statutory and regulatory scheme governing the habitability of multifamily dwellings establishes a standard of conduct for landlords. It is thus available as evidence for determining the duty owed by landlords to tenants. Defendant's eight-unit building was a "multiple dwelling" subject to

the requirements of the regulations.[6] Regulation 602.3(f)(2)(i) of the "Regulations for the Construction and Maintenance of Motels and Multiple Dwellings" effective July 19, 1968, provided that "[b]uilding entrance doors and exterior exit doors shall be equipped with heavy duty lock sets." [7] The absence of a lock at the time of Mrs. Trentacost's assault was contrary to the Legislature's standard of care. Since the violation was clearly established it constitutes evidence of defendant's negligence.

## IV

### Conclusion

We have been presented with the opportunity to delineate the responsibilities of residential landlords for the living conditions of their tenants. Changes in the social and economic environment have caused the character of that responsibility to evolve from its origin in medieval property law. Although he is not an insurer of his tenants' safety, a landlord is definitely no mere bystander. See *Kline*, 141 *U.S.App.D.C.* at 374, 439 *F*.2d at 481. All three branches of government have recognized this development, and have expressed in varying ways the content of a new landlord-tenant estate. Its paramount concern is with health and safety. Accordingly, the expense involved in making a dwelling secure and habitable does not diminish the landlord's responsibility.

Our analysis has led to the conclusion that a landlord has a legal duty to take reasonable security measures for tenant protection on the premises. His obligation to provide safe and

---

[6]The statute defines "multiple dwelling" to include all structures "in which three or more units of dwelling space are occupied * * * by three or more persons who live independently of each other." *N.J.S.A.* 55:13A–3(k).

[7]As amended, the present regulation is compiled at *N.J.A.C.* 5:10–19.6(c)(2). The entire set of current multiple dwelling regulations is set forth at *N.J.A.C.* 5:10–1.1 *et seq.*

habitable premises gives rise to potential liability on alternative grounds of conventional negligence and the implied warranty of habitability. Together these theories will serve to protect the otherwise precarious position of the individual tenant in a manner consistent with modern conceptions of public policy.

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

SCHREIBER, J., concurring.

The narrow question presented in our order granting certification in this case is "whether there was a duty on the part of the landlord to provide a lock for the door which opened into the common access area of the building where the attack on the tenant occurred." I would answer affirmatively based on a traditional tort theory.

The Legislature has declared that the Hotel and Multiple Dwelling Law, *N.J.S.A.* 55:13A–1 *et seq.* "being . . . remedial legislation necessary for the protection of the health and welfare of the residents of this State in order to assure the provision therefor of decent, standard and safe units of dwelling space, shall be liberally construed to effectuate the purposes and intent thereof." *N.J.S.A.* 55:13A–2. That underlying policy was furthered when the Commissioner of Community Affairs adopted regulation *N.J.A.C.* 5:10–605.3(f)(2),[1] which provided in pertinent part:

---

[1]This regulation was subsequently amended. See *N.J.A.C.* 5:10–19.-6(c)(2)(i).

Security Requirements—The following provisions shall apply to all buildings heretofor [*sic*] or hereafter erected that may be classified in residential occupan-

cy group L–2. Existing buildings shall comply with the requirements of this Section within two years after the effective date of these regulations.

(i) Building entrance doors and other exterior exit doors shall be equipped with heavy duty lock sets. Latch sets shall have stop-work in the inside cylinder controlled by a master key only. Outside cylinders of main entrance door locks shall be operated by the tenant's key, which shall not be keyed to also open the tenant's apartment entrance door. Main entrance door locks shall be kept in the locked position and shall be freely openable from the inside at all times. Other exterior exit doors shall be locked to prevent entry and shall be freely openable from the inside at all times.

This regulation, having the effect of law, *N.J.S.A.* 55:13A–6(e) and *N.J.A.C.* 5:10–1.7, prescribed a standard of conduct for owners of multiple dwellings (buildings with three or more housing units, *N.J.S.A.* 55:13A–3(k)) with respect to a part of the premises under the landlord's control. A tenant may have a cause of action in negligence for failure of the landlord to comply with that standard. Chief Justice Weintraub wrote in *Michaels v. Brookchester, Inc.*, 26 *N.J.* 349 (1958), referring to the Tenement House Act, *N.J.S.A.* 55:1–1 *et seq.*, the predecessor of the Hotel and Multiple Dwelling Law:

Our statute does not expressly authorize a suit by one injured by reason of a landlord's violation and hence does not create a statutory cause of action as that term is understood. Rather, in harmony with our usual approach to statutes of this kind, the act is deemed to establish a standard of conduct, and to permit the intended beneficiaries to rely upon a negligent failure to meet that standard in a common law action for negligence. *Evers v. Davis*, 86 *N.J.L.* 196 (*E. & A.*1914); *Daniels v. Brunton, supra* (7 *N.J.* 102). [*Id.* at 386]

The principle enunciated in *Michaels* is equally applicable here.

I find no need to search for or rely upon any other doctrine to respond to the question certified. See *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 388 (1975) (Clifford and Schreiber, JJ., concurring).

Justice CLIFFORD joins in this opinion.

CLIFFORD, J., dissenting in part.

The sense of conviction which prompted my agreement with Justice Schreiber in *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 388 (1975) (concurring opinion), remains undiminished by time, events, or any development in landlord-tenant law. I therefore join fully in his concurring opinion today.

In addition, I take this opportunity to register disagreement with the notion that liability can be imposed on the defendant landlord on the theory of implied warranty of habitability. Emphasizing the growing presence of crime in society the Court declares today that "the landlord's implied warranty of habitability obliges him to furnish reasonable safeguards to protect tenants from foreseeable criminal activity on the premises", *ante* at 228; and that "[s]ince [this] undertaking exists independently of [the landlord's] knowledge of any risks, there is no need to prove notice of a defective and unsafe condition." *Ante* at 228.

The harsh realities of modern life are all too well-known. I share the majority's concern with them. But novel application of the implied warranty of habitability to the baleful conditions reflected in those realities is unwarranted and ill-advised. See *Braitman, supra,* 68 *N.J.* at 387–88; *Dwyer v. Skyline Apartments,* 123 *N.J.Super.* 48, 54–56 (App.Div.), aff'd. *o. b.* 63 *N.J.* 577 (1973). See also *Hall v. Fraknoi,* 69 *Misc.2d* 470, 330 *N.Y.S.* 2d 637 (Civ.Ct.N.Y.1972). In practical effect this exercise predicates what amounts to absolute liability solely upon the relationship between the landlord and tenant and upon loose notions of foreseeability. In my view the existence of a duty here should not be grounded simply on a special relationship between the parties but rather should arise from the particular circumstances of the case, including foreseeability. See *Braitman, supra* ; *Caputzal v. The Lindsay Co.,* 48 *N.J.* 69, 75–76 (1966); *Dwyer, supra* ; *Goldberg v. Housing Authority,* 38 *N.J.* 578 (1962). See

also *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 141 *U.S.App.D.C.* 370, 374–377, 439 *F.*2d 477, 481–84 (D.C.Cir.1970); *Rowland v. Christian*, 69 *Cal.*2d 108, 113, 443 *P.*2d 561, 564, 70 *Cal.Rptr.* 97, 100 (1968). Clearly the inquiry must involve a fair balancing of the relative interests of the parties, the nature of the risk, and the public interest in the proposed solution. *Goldberg, supra*, 38 *N.J.* at 583. This process has been well served in the past through the application of traditional negligence principles. I perceive no compelling reason for departing from that practice.

SCHREIBER, J., concurring in the result.

CLIFFORD, J., concurring in the result and dissenting in part.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—None.